KELLY EUGENE RHYNE, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 36064

January 16, 2002

38 P.3d 163

[Rehearing denied March 6, 2002]

BECKER, J., with whom ROSE, J., agreed, dissented in part.

*Matthew J. Stermitz,* Elko, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Gary D. Woodbury,* District Attorney, and *Alvin R. Kacin,* Deputy District Attorney, Elko County, for Respondent.

**OPINION**

By the Court, MAUPIN, C. J.:

Kelly Eugene Rhyne appeals from a judgment of conviction, entered pursuant to a jury verdict, of first-degree murder and from a sentence of death.[1]

---

[1]Rhyne was also convicted of conspiracy to commit murder, but the district court declined to enter a judgment on the verdict or to impose sentence. Moreover, Rhyne did not file a notice of appeal from the conspiracy verdict. The appeal from the murder conviction and death sentence is automatic pur-

After careful review of the record on appeal and all of Rhyne's claims of error, we conclude that the district court erred by intervening in Rhyne's relationship with his attorneys but that Rhyne is estopped from complaining because he invited the error by seeking the district court's permission to call a witness despite his attorney's disagreement. We reject Rhyne's claims that the prosecutor committed misconduct warranting reversal, and we conclude that the death sentence was appropriately imposed. Rhyne's remaining contentions are either without merit or are unsupported by cogent argument and authority.

## STATEMENT OF THE FACTS

At around 9:00 p.m. on the night of October 31, 1998, Kelly Rhyne arrived at what was then known as the Miner's Camp bar. James Mendenhall and the victim, Donald "Lobo" Brown, were also at the bar. An auction was taking place at the bar, and people were drinking and bidding. Photographs taken during the auction and eyewitness testimony confirmed that Rhyne was wearing a red t-shirt, a black vest, jeans, a black jacket, and white high-top tennis shoes. Mendenhall was wearing a denim shirt, a cap, and boots.

Sometime before 10:00 p.m., a patron at the bar overheard Rhyne say to Mendenhall, "I hate that f—ing guy." Mendenhall replied, "Don't do anything in here. We'll wait until he gets outside." The patron ultimately concluded that Rhyne and Mendenhall were referring to the victim, Donny Brown. After the auction ended, Brown and Rhyne were seen leaving the bar a few minutes apart. Mendenhall then became involved in an altercation near the front door of the bar. After the altercation, Rhyne returned, asked Mendenhall if he was okay, and then left the bar with Mendenhall. When they returned later, Mendenhall's shirt had blood on it. He removed it and placed it over a chair. Rhyne later retrieved the shirt and again left the establishment. Later, via aerial search, police found the shirt on the roof of a building near Rhyne's residence.

At around 1:00 a.m., a porter at a nearby hotel observed two men place a body in a dumpster. Police later found the body of Donny Brown in the dumpster, apparently beaten to death. His head had been crushed, and there was a large v-shaped indentation in the side of his head that matched the lug of Mendenhall's

suant to NRS 177.055; however, an appellant must file a separate notice of appeal to challenge collateral convictions resulting from the prosecution at issue. Here, without a judgment of conviction or a notice of appeal, this court is without jurisdiction to consider Rhyne's claim that the conspiracy verdict is inconsistent with the acquittal on robbery.

boot. There were also "ladder-like" marks on Brown's face that were suggestive of a pattern from the sole of a tennis shoe.

When police contacted Rhyne at his residence at around 3:00 a.m., he was alert and cooperative. Rhyne maintained that he had arrived at the bar around 9:00 p.m. and left only once to get cigarettes at around 12:00 a.m. Rhyne allowed police to search his room and told them he had been wearing a pair of workboots that night. But the boots Rhyne pointed out had no blood on them, and police found nothing incriminating in the residence.

When the police returned to Rhyne's residence at 8:00 a.m., he voluntarily accompanied them to the police station and gave a statement. He again maintained he had been at the bar all evening and had only left once to purchase cigarettes. He denied spending time with Mendenhall and denied leaving with him at any time. The police arrested Rhyne after the interview.

During Rhyne's interview, police located Mendenhall, who accompanied the police to the station and was ultimately arrested. DNA tests revealed a substantial amount of Brown's blood on Mendenhall's clothes and boots. A small amount of Brown's blood was also found on Rhyne's pants, jacket, and on his ring. The white tennis shoes Rhyne had been seen wearing and his red shirt and black vest were never found.

The State charged Rhyne and Mendenhall with murder, felony murder, robbery, and conspiracy to commit murder and filed notices of intent to seek the death penalty against both men. On August 8, 1999, the district court granted a motion to sever the trials, and on August 31, 1999, Mendenhall entered an *Alford*[2] plea to one count of second-degree murder and one count of conspiracy to commit murder. The State agreed not to oppose concurrent sentences, and Mendenhall agreed to provide a written statement regarding the incident. He also agreed that he could be called to testify at Rhyne's trial, but that his testimony was not part of the plea negotiations. Mendenhall ultimately testified against Rhyne.

The jury trial began March 15, 2000. Much of the incriminating evidence presented at trial has already been noted: Rhyne's professing hatred toward Brown on the night of the murder and Mendenhall's ominous response; the suspicious disappearance of the shoes, shirt, and vest that Rhyne was wearing that night; the presence of the victim's blood on Rhyne's pants, jacket, and ring; and Rhyne's false statement to police that he had never spent time with or left the bar with Mendenhall. In addition, Mendenhall testified and incriminated Rhyne while denying his own culpability. According to Mendenhall, after his altercation by the door of the bar, Rhyne came to the door and called to him to come outside.

[2]*North Carolina v. Alford,* 400 U.S. 25 (1970).

When he followed Rhyne outside and into the alley, he saw a man slumped over on the ground. Rhyne asked him for help putting the man in the dumpster. Mendenhall initially refused, but Rhyne "had a crazy look in his eyes," and he threatened that if Mendenhall did not help him throw Brown's body into the dumpster, Mendenhall would end up lying alongside of him. Mendenhall was afraid and reluctantly helped Rhyne. As they carried the body to the dumpster, Mendenhall slipped and fell. Mendenhall also testified that in moving the body he got blood on his hands and clothes. After moving Brown's body, Mendenhall went back into the bar. When Rhyne came back into the bar, he told Mendenhall to keep his mouth shut and to go home.

The jury returned a verdict convicting Rhyne of first-degree murder and conspiracy to commit murder, but acquitting him of robbery. At the close of the three-day penalty phase the jury returned a sentence of death. The jury found the three aggravating circumstances alleged by the State: torture or mutilation, a prior conviction for battery by a prisoner, and a prior conviction for attempted assault with a deadly weapon. The jury found two mitigating circumstances: the murder was committed while Rhyne was under an extreme mental or emotional disturbance, and Rhyne has suffered a serious mental disorder during his life as a result of his long struggles with bipolar disorder and problems taking his medications. The jury found that the mitigating circumstances did not outweigh the aggravating circumstances and imposed a sentence of death. On May 1, 2000, the district court entered a written judgment of conviction and sentence of death pursuant to the jury's verdict. This automatic appeal followed.

## DISCUSSION

*The district court's interference in Rhyne's relationship with his attorneys*

During the guilt phase of the trial Rhyne and his attorneys reached a point of disagreement over whether a witness, Chris Brodhecker, should be called to testify. Rhyne wanted Brodhecker called as a defense witness, while Rhyne's counsel felt Brodhecker was unreliable and would potentially cause the defense case more harm than good. Brodhecker was incarcerated with Mendenhall prior to the trial and proposed to testify that Mendenhall had essentially confessed to him to acting alone in killing Donny Brown.

On March 28, 2000, the district court held an ex parte hearing with Rhyne and his counsel to discuss the dispute. At the hearing, the district court inquired extensively into Rhyne's reasons for wanting to call Brodhecker and into counsel's reasons for not

wanting to call him. The district court canvassed Rhyne thoroughly on the risks that counsel felt were associated with calling Brodhecker and determined that Rhyne fully understood that Brodhecker's testimony could backfire on the defense. The district court then directed counsel to call Brodhecker.

On appeal, Rhyne claims the district court should not have allowed him to direct the actions of his counsel or should have canvassed him regarding his right to represent himself. We conclude that the district court erred by interjecting itself into the attorney-client relationship. And we take this opportunity to recognize the well-established rule that while the client may make decisions regarding the ultimate objectives of representation, the trial lawyer alone is entrusted with decisions regarding legal tactics such as deciding what witnesses to call:

> Once counsel is appointed, the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate—and ultimate—responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop.[3]

Indeed, Justice Harlan has also suggested that "a lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval."[4] Only the defendant, of course, can make certain fundamental decisions regarding the objectives of representation, such as whether to present a defense of not guilty by reason of insanity.[5] However, with few exceptions, the means of representation, *i.e.*, trial tactics, remain within counsel's control.[6]

In a case apposite to this one, the California Supreme Court upheld a trial court's denial of a defendant's request, not joined in by counsel, to present certain evidence at a capital trial.[7] The court explained that except for the defendant's exercise of fundamental rights, like the right to testify, "an attorney representing a

---

[3]*Wainwright v. Sykes*, 433 U.S. 72, 93 (1977) (Burger, C.J., concurring); *see also United States v. Miller*, 643 F.2d 713, 714 (10th Cir. 1981) ("Whether to call a particular witness is a tactical decision and, thus, a 'matter of discretion' for trial counsel." (citation omitted)); *Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980) ("[T]he decision whether to subpoena certain witnesses rests upon the sound professional judgment of the trial lawyer.").

[4]*Brookhart v. Janis*, 384 U.S. 1, 8 (1966) (Harlan, J., concurring).

[5]*Johnson v. State*, 117 Nev. 153, 161-63, 17 P.3d 1008, 1014-15 (2001).

[6]*Id.* at 163, 17 P.3d at 1015.

[7]*People v. Alcala*, 842 P.2d 1192, 1232 (Cal. 1992).

criminal defendant has the authority to control the presentation of the defense."[8] In another pertinent case, the California court approved a trial court's denial of a defendant's request, opposed by counsel, to act as co-counsel.[9] The court stated that generally an attorney should not "be compelled over his objection to undertake the defense of an accused on terms which undermine the powers normally ascribed to counsel."[10] Appointed counsel should not be required to " 'surrender any of the substantial prerogatives traditionally or by statute attached to his office.' "[11]

Thus, the district court should not have attempted to resolve the dispute between Rhyne and his counsel. Defense counsel was entitled to decide whether or not to call Brodhecker.

The district court error notwithstanding, we also conclude that under the facts of this case, Rhyne is now estopped from raising this claim on appeal because he invited the error by asking the district court to allow him to call the witness.[12] The district court thoroughly canvassed Rhyne regarding the attendant risks of calling Brodhecker, Rhyne clearly sought to call Brodhecker notwithstanding those risks, and Rhyne cannot now be heard to complain that he received exactly what he asked for. Rhyne also challenges the district court's interference during the penalty phase. At Rhyne's insistence, and over defense counsel's objections, the district court prohibited defense counsel from presenting the testimony of three doctors and Rhyne's mother. Again, the record reflects that, while the court should not have intervened, Rhyne was aware of his counsel's concerns, and we conclude that Rhyne is estopped from raising the issue now.

Finally, we note that at no time did Rhyne ask to represent himself; therefore, the district court did not err in failing to conduct a *Faretta* canvass.[13]

*The premeditated murder and felony-murder instruction*

The district court instructed the jury that it could convict Rhyne

---

[8]*Id.*

[9]*People v. Hamilton,* 774 P.2d 730, 740-42 (Cal. 1989).

[10]*Id.* at 741.

[11]*Id.* (quoting *People v. Mattson,* 336 P.2d 937, 949 (Cal. 1959)).

[12]*See Jones v. State,* 95 Nev. 613, 617, 600 P.2d 247, 250 (1979) (recognizing that where a defendant participates in the alleged error, he is estopped from raising any objection on appeal); *Sidote v. State,* 94 Nev. 762, 762-63, 587 P.2d 1317, 1318 (1978) (holding that defendant who invites district court action perceived as favorable to him may not then claim it as error on appeal).

[13]*See Faretta v. California,* 422 U.S. 806 (1975).

of first-degree murder under a theory of either premeditated and deliberate murder or felony murder, based on the robbery charge. Rhyne complains that because he was acquitted of robbery, there is no way to know which of the two theories the jury relied on to convict, and that the murder verdict is therefore infirm. We reject this contention.

The United States Supreme Court has held that a jury may return a general guilty verdict on an indictment charging several acts in the alternative even if one of the possible bases of conviction is unsupported by sufficient evidence.[14] Specifically, as long as both theories are legally sufficient, the verdict will stand even if one theory is ultimately found to be factually unsupported by the evidence.[15] We have applied this principle to charging alternative theories of first-degree murder.[16] Regardless of whether there was sufficient evidence of robbery, there is sufficient evidence to support a verdict of premeditated and deliberate murder.[17] Rhyne was properly convicted of first-degree murder.

*Prosecutorial misconduct*

Rhyne offers several allegations of prosecutorial misconduct by the State that he claims warrant reversal. None of these claims has merit. Specifically, we first conclude that the State committed no error in asking the jury to draw a reasonable inference that Rhyne's tennis shoes had disappeared by his own action because they were incriminating.[18] We further conclude that the State's brief reference in closing arguments to Rhyne's failure to produce his white tennis shoes and thereby ''prove himself not guilty'' did not implicate his post-arrest silence. The remark improperly suggested that Rhyne bore some burden to prove innocence, but it was brief, and the prosecutor immediately corrected himself and advised the jury that Rhyne bore no such burden. We conclude that the remark did not prejudice Rhyne.[19] The prosecutor did not

---

[14]*Griffin v. United States*, 502 U.S. 46, 56-57 (1991).

[15]*Id.; see also Turner v. United States*, 396 U.S. 398, 420 (1970).

[16]*See Thomas v. State*, 114 Nev. 1127, 1145, 967 P.2d 1111, 1123 (1998).

[17]*Id.; see also Sochor v. Florida*, 504 U.S. 527, 538 (1992) (declining to presume that a general verdict rests on a ground that the evidence does not support) (citing *Griffin*, 502 U.S. at 59-60).

[18]*See Hern v. State*, 97 Nev. 529, 531, 635 P.2d 278, 279 (1981) (stating that the jury must be given the right to make logical inferences which flow from the evidence).

[19]*Cf. McNelton v. State*, 115 Nev. 396, 408-09, 990 P.2d 1263, 1271-72 (1999).

call a witness a liar; he merely summarized the testimony of a State's witness, which was already on the record.[20]

Rhyne's contention that the State improperly relied on Mendenhall's testimony is also without merit. The jury was fully informed of the circumstances of Mendenhall's plea agreement and was capable of evaluating Mendenhall's version of the facts.

We also reject Rhyne's complaint of excessive pretrial publicity. Rhyne has failed to demonstrate that any juror was in fact prejudiced by the pretrial media coverage of the case. As we noted in *Sonner v. State,* where a defendant fails to demonstrate actual bias on the part of the jury ultimately empaneled, this court will not presume prejudice based on extensive pretrial publicity.[21]

*Other claims*

Rhyne charges that Latinos were underrepresented in the two jury venires from which his jury was drawn in violation of the fair-cross-section requirement.[22] We conclude that even if Rhyne can show underrepresentation, he has failed to sustain his burden of demonstrating any systematic exclusion in the process used to compile the jury pools.[23] Rhyne also contends that his non-Mirandized, prearrest statement to the police at the Elko police station was involuntary and should have been suppressed. This claim is without merit. Rhyne was not in custody.[24] He also claims that the State improperly exercised peremptory challenges against women jurors in violation of *Batson v. Kentucky*.[25] However, Rhyne failed to object to the State's actions below and is therefore precluded from raising the issue on appeal.[26] Moreover, we

---

[20]*See, e.g., Klein v. State,* 105 Nev. 880, 884, 784 P.2d 970, 973 (1989) (holding that it is permissible for the prosecutor to argue to the jury that facts in evidence established that witnesses had or did not have motives to lie).

[21]*Sonner v. State,* 112 Nev. 1328, 1336, 930 P.2d 707, 712-13 (1996).

[22]*See Duren v. Missouri,* 439 U.S. 357, 364-66 (1979).

[23]*See id.; State v. Lopez,* 692 P.2d 370 (Idaho Ct. App. 1984); *U.S. v. Footracer,* 189 F.3d 1058, 1062-63 (9th Cir. 1999) (holding that a jury selection process which treats all groups equally but may have a disparate impact on one or more groups does not "systematically exclude" any group).

[24]*See Alward v. State,* 112 Nev. 141, 154-55, 912 P.2d 243, 252 (1996); *see also Mitchell v. State,* 114 Nev. 1417, 1423-24, 971 P.2d 813, 818 (1998).

[25]476 U.S. 79 (1986).

[26]*See Dias v. Sky Chefs, Inc.,* 948 F.2d 532, 534 (9th Cir. 1991) ("*Batson* objections must occur as soon as possible, preferably before the jury is sworn."); *Chambers v. Johnson,* 197 F.3d 732, 735 (5th Cir. 1999) (holding

conclude that, under the totality of the circumstances, he has not demonstrated a prima facie showing of gender discrimination.[27] Rhyne has also failed to demonstrate that the district court should have granted a change of venue.[28] Likewise, he has failed to show error in the district court's decision to allow the jurors to ask questions during the guilt phase of the trial; the record reflects that the district court properly adhered to the procedural safeguards set forth by this court in *Flores v. State*.[29] We decline Rhyne's invitation to revisit our holding in *Flores*. Further, Rhyne has failed to demonstrate any bias reflected in the questions submitted by the jury. Finally, there is no evidence that the jury's guilty verdict was the product of passion and prejudice, and the district court did not err in denying a motion to set aside the verdict.

Rhyne also makes several summary claims of error, which he fails to support with cogent argument or discussion of relevant authority.

For example, Rhyne summarily claims there was insufficient evidence of his specific intent to kill Brown. He also challenges several jury instructions without citation to any authority to support his claims that the instructions were erroneous. Specifically, Rhyne contends that Instruction 43, directing the jury to decide whether Mendenhall was an accomplice, should have included the phrase: "evidence of an oral statement ought to be viewed with caution." He also claims that Instruction 26 improperly permitted the jury to find Rhyne guilty of either felony murder or premeditated murder without a unanimous decision on either theory. However, neither contention is supported by specific argument or authority, and we discern no error.[30] Rhyne also argues there was no evidence supporting instructions on robbery; Rhyne was acquitted of robbery.

Rhyne next contends that evidence was improperly admitted at the penalty phase because it was inflammatory and prejudicial. Specifically, Rhyne challenges the admission of evidence of his

that a *Batson* objection must be asserted before the venire is dismissed and that a timely objection is an essential condition to the assertion of the *Batson* claim); *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994) (holding that *Batson* challenges are waived unless objected to before trial begins).

[27]*See Libby v. State*, 113 Nev. 251, 255, 934 P.2d 220, 222 (1997).

[28]*See* NRS 174.455.

[29]114 Nev. 910, 965 P.2d 901 (1998).

[30]The latter contention is meritless. *See Walker v. State*, 113 Nev. 853, 870, 944 P.2d 762, 773 (1997).

tattoos, an allegation of his substance abuse, his criminal history, threats he made against his attorney, comments he made about a police officer, an incident in which he spat on another inmate, two incidents in which he had been forcibly subdued by police while in custody, an attack he made on a deputy, threats he made to another inmate, and the fact that he did push-ups in his cell. Again, however, Rhyne fails to offer any legal authority for why any of this evidence was inadmissible.[31] Rhyne also summarily challenges the district court's refusal to issue instructions for directed verdicts or grant a motion to dismiss at the close of the State's case in chief.

We reject all of these claims. "Contentions unsupported by specific argument or authority should be summarily rejected on appeal."[32] Moreover, none of these claims present persuasive, cogent argument that any error, defect, irregularity, or variance affected Rhyne's substantial rights.[33]

*Additional penalty phase issues*

*Aggravating circumstances*

The State alleged as aggravating circumstances pursuant to NRS 200.033(2)(b) that Rhyne had been previously convicted of two prior violent felonies: battery by a prisoner and attempted assault with a deadly weapon. We reject Rhyne's claim that the battery in this case is not the type of conduct anticipated by the statute. We also reject Rhyne's assertion that a prior conviction based on a plea entered pursuant to *North Carolina v. Alford*[34] is legally insufficient to support an aggravating circumstance.[35] We decline to require inquiry into the particular circumstances and negotiations involved in defendants' decisions to enter pleas in prior cases. In addition, the record reflects sufficient evidence of the

---

[31]*See* NRS 175.552(3) (providing that at the penalty phase "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible").

[32]*Mazzan v. Warden,* 116 Nev. 48, 75, 993 P.2d 25, 42 (2000); *see also Maresca v. State,* 103 Nev. 669, 673, 748 P.2d 3, 6 (1987).

[33]*See* NRS 178.598; *see also* NRS 177.255 (the court shall give judgment without regard to technical error or defect which does not affect the substantial rights of the parties).

[34]400 U.S. 25 (1970).

[35]*Cf. Jones v. State,* 105 Nev. 124, 127-28, 771 P.2d 154, 156 (1989) (holding that conviction based upon a plea of nolo contendere is legally valid for purposes of sentencing enhancements).

aggravating circumstance of mutilation pursuant to NRS 200.033(8).[36]

The dissent centers its analysis on the question of who was responsible for mutilating the victim and on Rhyne's mental status. First, regardless of which attacker inflicted the mutilating injuries on the victim, as a participant in the murder Rhyne is equally culpable for the mutilation.[37] Second, the jury actually found two mitigating circumstances based on Rhyne's mental problems. However, the record shows that Rhyne was competent at the time of the murder and during his trial. The jury could therefore properly find that the mitigating circumstances did not outweigh the aggravating circumstances and that death was the appropriate sentence.[38]

### Constitutionality of the death penalty

Finally, Rhyne contends that Nevada's death penalty scheme is unconstitutional because NRS 175.552(3), in permitting the admission of "any evidence," fails to provide adequate guidance and improperly expands the scope of aggravating information to be considered by the jury, and because NRS 200.033 fails to narrow sufficiently the class of offenders eligible for the death penalty. In previous cases we have considered the same challenges Rhyne now makes to the constitutionality of NRS 175.552(3) and NRS 200.033, and we have rejected them.[39] We are not persuaded that our prior holdings should be reconsidered.

### Mandatory review of death sentence pursuant to NRS 177.055

NRS 177.055(2) requires this court to conduct a review of the death sentence to evaluate: whether the evidence supports the finding of the aggravating circumstances; whether the sentence was imposed under the influence of passion, prejudice, or any arbitrary factor; and whether the sentence of death is excessive, considering both the crime and the defendant. We have reviewed this case, and we conclude that the evidence adduced at trial supports the finding of the aggravating circumstances and that the death sentence in this case is not excessive or a result of passion or prejudice.

---

[36]See Browne v. State, 113 Nev. 305, 316-17, 933 P.2d 187, 193-94 (1997).

[37]See Byford v. State, 116 Nev. 215, 240, 994 P.2d 700, 717, cert. denied, 531 U.S. 106 (2000).

[38]See NRS 175.554(3); see also Leonard v. State, 114 Nev. 1196, 1216, 969 P.2d 288, 300-01 (1998).

[39]See, e.g., Middleton v. State, 114 Nev. 1089, 1116-17, 968 P.2d 296, 314-15 (1998); Colwell v. State, 112 Nev. 807, 814, 919 P.2d 403, 407-08 (1996).

Accordingly, we affirm the judgment of conviction and the sentence of death.[40]

YOUNG, SHEARING, AGOSTI and LEAVITT, JJ., concur.

BECKER, J., with whom ROSE, J., agrees, concurring in part and dissenting in part:

I concur with the majority opinion in all respects save one: the excessiveness of the death penalty. I do not condone Rhyne's actions. His senseless murder of Mr. Brown and the grief Rhyne has caused to Mr. Brown's family are certainly reprehensible. However, the Constitution of the United States prohibits the automatic imposition of the death penalty on persons convicted of first-degree murder.[1] Because of this, the United States Supreme Court has consistently stated that death penalty cases warrant a higher level of scrutiny because, as Justice Stewart stated in *Furman v. Georgia:*[2]

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice.

The concept that death is different has been the backbone for high court decisions emphasizing that procedures, evidentiary rules or doctrines permissible in non-capital cases may violate the constitutional prohibitions when applied to capital punishment prosecutions.[3]

To survive constitutional scrutiny, death penalty statutory schemes must narrow the class of individuals eligible to receive a death sentence. They must also provide for ''guided discretion'' in the imposition of the penalty. The goal is to ensure individualized sentencing and eliminate the possibility that the death sentence is being imposed automatically, mechanically or arbitrarily.[4]

---

[40]On March 26, 2001, Rhyne moved to supplement his appendix with 2000 census data on the number of Hispanics in the Elko County population. The State filed its opposition to the motion on March 30, 2001. The census data was not presented to the district court; therefore, we deny Rhyne's motion: ''On appeal this court will not consider anything outside the trial record.'' *Smithart v. State,* 86 Nev. 925, 930, 478 P.2d 576, 580 (1970).

[1]*Woodson v. North Carolina,* 428 U.S. 280 (1976) (mandatory death penalty system held invalid).

[2]408 U.S. 238, 306 (1972).

[3]*Green v. Georgia,* 442 U.S. 95 (1979) (hearsay rules could not be applied to exclude defendant's mitigation evidence); *Gardner v. Florida,* 430 U.S. 349 (1977) (confidential presentence investigation report procedure violates due process in capital sentencing context).

[4]*Proffitt v. Florida,* 428 U.S. 242 (1976).

Thus, an individual is not eligible for the death penalty simply because he or she commits a brutal first-degree murder. There must be something more, either in the defendant's history, or in the commission of the murder, that warrants the ultimate and irrevocable sanction of death.

Moreover, state courts have the responsibility for ensuring that statutory aggravators are not so liberally construed that the narrowing function of the statutory scheme is circumvented or eliminated.[5] Finally, in states where the statutes require the weighing of aggravating and mitigating circumstances, an appellate court cannot simply assume that the invalidity of an aggravating circumstance would not affect the sentencing body's decision to impose the death penalty. Whenever a statutory aggravator is invalidated on appeal, the appellate court must either: (1) remand the case for a new penalty phase, (2) reweigh the aggravating and mitigating circumstances itself, or (3) determine that any error in the aggravating circumstance is harmless beyond a reasonable doubt.[6]

In Nevada, there are fourteen circumstances by which first-degree murder may be punishable by death.[7] Because of the large number of aggravating circumstances, it is essential that this court construe these aggravators to avoid undermining the constitutionality of our death penalty scheme. These same considerations should, and do, govern our review of death sentences for excessiveness.

We have recognized that the facts surrounding an aggravating circumstance are important in reviewing the appropriateness of the death penalty.[8] In addition, we have noted that, when considering whether the death penalty is excessive, we will look at various other objective factors such as the influence drugs or alcohol may have played in the commission of the crime, the treatment of co-defendants, the mental state of the defendant, the nature and quantity of the defendant's prior history of violence, and the age of the defendant. The mere presence of any of these factors is not controlling. Instead, we must look at the totality of the circumstances surrounding the defendant and the crime in making a determination of excessiveness.[9]

[5]*Walton v. Arizona,* 497 U.S. 639 (1990); *Maynard v. Cartwright,* 486 U.S. 356 (1988).

[6]*Sochor v. Florida,* 504 U.S. 527 (1992).

[7]NRS 200.033.

[8]*Haynes v. State,* 103 Nev. 309, 739 P.2d 497 (1987); *Chambers v. State,* 113 Nev. 974, 944 P.2d 805 (1997) (in light of mitigating circumstances, death penalty was not warranted where only aggravating circumstances were armed robbery convictions over fifteen years old).

[9]*Dennis v. State,* 116 Nev. 1075, 13 P.3d 434 (2000).

Two categories of aggravating circumstances are present in Rhyne's case: (1) the murder was committed by a person who had been convicted of a felony involving the use or threat of violence to the person of another, and (2) the murder involved mutilation of the victim. The underlying facts supporting these aggravators, together with the disparate treatment given to co-defendant Mendenhall, and Rhyne's significant history of mental illness, are the reasons I conclude that the death penalty is excessive in this case.

As to the first aggravating circumstance, Rhyne was previously convicted of battery by a prisoner and attempted assault with a deadly weapon. The "battery" consisted of Rhyne throwing a cup full of feces on a fellow inmate through the food slot of his cell door. It is technically a felony involving the use of violence, but it is hardly the type of violence that should provide a threshold for the imposition of the death penalty.

The attempted assault with a deadly weapon presents a closer issue. Two independent witnesses, tourists from California, observed a confrontation between Rhyne and a group of teenagers in downtown Reno. According to this couple, Rhyne was mumbling to himself when he was surrounded by the teenagers who appeared to be taunting him. The teenagers claimed Rhyne swung at or hit one of their friends. The teenager fell and was seriously injured when his head hit a concrete projection. The tourists claimed Rhyne never attempted to hit the teenager. Instead, the teenager, who was shadowboxing around Rhyne, tripped and fell. A glove containing a rock constituted the deadly weapon.

Rhyne entered an *Alford*[10] plea, against the advice of counsel. I agree with the majority that a conviction based upon an *Alford* plea is sufficient to support an aggravating circumstance. However, it is a factor to be considered when reviewing a death sentence for excessiveness. Given the testimony of the independent witnesses, I conclude that this is also not the type of violent history which should provide a threshold for the death penalty.

The second aggravating circumstance involves our holding in *Browne v. State.*[11] I agree that the definition of mutilation given in *Browne* and in the jury instruction in this case, that mutilation is disfiguration beyond the act of killing, meets constitutional muster. However, I am concerned with the application of the definition in cases like this which involve killing by blunt force trauma. Nevertheless, the evidence certainly supports a finding of mutilation under *Browne*.

For purposes of evaluating the excessiveness of the punishment, the question is whether that mutilation was primarily caused by

---

[10]*North Carolina v. Alford,* 400 U.S. 25 (1970).

[11]113 Nev. 305, 933 P.2d 187 (1997).

Rhyne. The most significant damage to the victim's head, the area which would support a finding of mutilation, was to the side of the head. The mark of Mendenhall's boot, not Rhyne's tennis shoe, was placed firmly over this area. The marks attributed to Rhyne's tennis shoe were on the victim's face, not the side of his head. Mendenhall's explanation that he accidentally stepped on the victim's face while helping Rhyne dispose of the body is incredible. The significant involvement by Mendenhall in the mutilation is an important factor when reviewing Rhyne's death sentence.

Mendenhall's disparate sentence is also a significant factor in evaluating Rhyne's sentence. Despite substantial evidence linking Mendenhall to first-degree murder, he was allowed to plead to second-degree murder and was sentenced to life in prison with the possibility of parole. Mendenhall testified that he had nothing to do with the murder and that he only helped to dispose of the body. During arguments, the State repeatedly claimed Mendenhall was a credible witness and downplayed his participation in the offense. Yet the eyewitness testimony and forensic evidence (the amount of blood on Mendenhall's clothes, the boot mark, etc.) belie Mendenhall's version of the events. In addition, if the State truly thought Mendenhall was credible, then he should not have been charged with first-degree murder or convicted of second-degree murder. Moreover, aside from the weak aggravators discussed above, there is no reason for the disparate treatment between these two equally culpable murderers.

Finally, there is the issue of Rhyne's severe mental illness. The jury found two mitigating circumstances: that Rhyne committed the murder while under an extreme mental or emotional disturbance, and that Rhyne suffered a serious mental disorder during his life. Rhyne's entire involvement with the criminal justice system is directly a product of his mental illness. Since the age of seventeen, Rhyne has suffered from a bipolar disorder. On occasion, this has escalated into paranoia.

Moreover, the record reflects Rhyne's illness is of the most severe form. It is not completely treatable. As a result, Rhyne's mood swings and unexpected behaviors are not fully controlled, even with medication. In addition, like many individuals with severe bipolar disorder, Rhyne's mental condition destabilizes quickly when he does not take his medication or when he mixes his medication with alcohol or other drugs. Rhyne's mental condition was the heart of the State's future dangerousness argument. He cannot be completely controlled, nor can he always be isolated from his fellow inmates. He might irrationally attack another inmate or a guard because he doesn't like what someone said or how a person looked.

While it is true that Rhyne's mental condition makes him a more difficult and time-consuming inmate to control, the record reflects that his incidents with fellow inmates have been few and of a minor nature (feces throwing, spitting, etc.). Rhyne is no different now than he has been his entire adult life, and his actions during that life are, at least in part, a product of the deficiencies in our mental health system.

Like many states, Nevada's statutes and mental health system are not designed to deal with individuals like Rhyne. Rhyne was institutionalized on several occasions because he posed a threat to himself or others. In each case, once he was partially stabilized, he was released from custody to a least restrictive environment as required by law. The problem is that persons like Rhyne cannot function very well in an unsupervised setting. They begin to destabilize, make threats or commit crimes, and then end up back in custody. They become part of a revolving door syndrome that tragically escalates into more violent crimes. If Rhyne had a history of violence unrelated to his illness, or if his previous convictions were based on more significant facts, the future dangerousness argument might be more compelling. Given the testimony in Rhyne's case, however, it appears to be no more than an argument to execute someone because they are mentally ill and tiresome to handle. A death penalty based on such concerns is excessive.

Rhyne should never, under any circumstance, be released from prison. But for the reasons outlined above, I conclude that Rhyne's sentence of death is excessive. I would vacate the judgment of death and impose a sentence of life in prison without the possibility of parole.