102 P.3d 890 (2004)
2004 WY 167
In the Interest of CC, a minor child.
BSC, Appellant (Respondent),
v.
Natrona County Department of Family Services, Appellee (Petitioner).
No. C-04-2.
Supreme Court of Wyoming.
December 17, 2004.
*891 Representing Appellant: BSC, pro se.
Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Dan S. Wilde, Senior Assistant Attorney General.
Guardian Ad Litem: Wendy S. Owens, Wyoming Legal Services, Inc., Casper, Wyoming.
Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.
GOLDEN, Justice.
[¶ 1] Pro se Appellant BSC appeals from the district court's order terminating his parental rights to CC. He claims that the district court erred by refusing to appoint an attorney to represent him and by refusing to continue the termination hearing after learning that BSC had ingested medication which could affect his ability to defend himself. BSC also claims Appellee Natrona County Department of Family Services (DFS) failed to follow its legal obligations to notify him when it took CC into custody. We conclude that clear and convincing evidence was presented at the hearing to support the district court's termination decision and do not find any errors mandating reversal in this case. We, therefore, affirm the district court's decision.

ISSUES
[¶ 2] BSC presents an unconventional list of issues on appeal:
1. Does Wyoming recognize Right to Counsel?
2. Are State Employee's [sic] above State Statutory obligations?
3. Does Wyoming recognize father's right to familial association?
4. Can D.F.S. conceal a child 7 months and fault parent for failure to support?
5. Must Guardian ad litem comply with Statutory obligations?

*892 6. Do Wyoming Courts recognize medications affecting ability to defend?
7. Can a Judicial officer ignore blatant violations of Due Process?
8. Do Wyoming courts recognize Double Jeopardy clause of United States and Wyoming Constitutions?
9. Do Wyoming Courts recognize conflicting testimony?
DFS phrases the issues as follows:
I. Whether the district court's finding that appellant's parental rights to CC should be terminated was established by clear and convincing evidence?
II. Whether appellant's lack of counsel at the hearing of September 23, 2003, violated the Wyoming or United States Constitution?
III. Whether the district court erred in proceeding with the termination hearing upon notice appellant was taking medication?
IV. Whether this appeal is without merit and is unsupported by cogent argument or pertinent authority?
The Guardian ad Litem for CC phrased the issues as follows:
1. Should Appellant's Appeal Be Dismissed, Or, in the Alternative, Should Sanctions be Imposed Against Appellant Due to Appellant's Failure to Comply With the Wyoming Rules of Appellate Procedure?
2. Did the Trial Court Properly Deny Appellant's Request for Counsel?
3. Did the State Violate Its Rules and Regulations, and if so, Did Such Violations Affect Appellant's Rights?
4. Does a Parent's Right to Familial Association Outweigh the Child's Rights?
5. Did the Trial Court Properly Consider Appellant's Failure to Pay Support?
6. Does the Child's Guardian ad Litem Have a Duty to Request Child Support?
7. Did the Trial Court Properly Proceed with Hearing on the State's Petition to Terminate Appellant's Parental Rights?
8. Was It Error to Receive Evidence of Unsubstantiated Allegations of Abuse and/or Neglect in an Action for Termination of Parental Rights?
9. Did the Trial Court Properly Weigh the Evidence?

FACTS
[¶ 3] CC was adopted by BSC and JC on May 1, 1995, when he was one and one-half years old. To say the least, CC's family life with BSC and JC was less than idyllic. Natrona County DFS investigated allegations that BSC and JC had abused or neglected CC in 1995 and 1996, although the allegations were not substantiated. In 1996 or 1997, the family apparently moved from Natrona County to New Mexico. New Mexico authorities filed a criminal action against BSC, charging him with sexually abusing CC's stepbrother. BSC eventually pled guilty to one count of criminal sexual contact with CC's stepbrother. The New Mexico conviction was actually BSC's second conviction for a sex crime. He had received a deferred sentence in Texas for criminal sexual contact in 1989. JC was also convicted of criminal conduct associated with the New Mexico case.
[¶ 4] BSC placed CC with the MM family in Natrona County, Wyoming, to conceal him from New Mexico authorities during the pendency of his criminal case. CC was neglected in the MM home, and DFS removed him from that home and placed him in protective custody. Although BSC and JC were reunified with CC in 1997, both parents were subsequently sentenced to prison in New Mexico for their respective crimes. Despite having knowledge of the problems in the MM household, BSC and JC again placed CC in MM's care during their terms of incarceration.
[¶ 5] After JC was released from prison, she retrieved CC from the MM home. Not surprisingly, CC suffered from a number of emotional and mental problems, including attention deficit hyperactivity disorder, oppositional defiant disorder, and depressive disorder. In January 2002, JC voluntarily relinquished custody of CC to DFS because she could not handle his behavioral problems. *893 DFS placed CC in foster care and attempted to rehabilitate JC so that the family could be reunited. DFS's efforts failed, and JC agreed to a plan for CC to be adopted by other parents. In the end, however, JC refused to execute a document relinquishing her parental rights because she was "scared to death that [BSC] could get custody of CC and there would be no way in hell that I could stop it."
[¶ 6] In July 2002, DFS notified BSC by mail that CC was in its custody, and DFS was in the process of developing a permanency plan. In response to that notification, BSC telephoned DFS. He told the DFS employee that "he was disabled" and "fixing to start some pretty heavy duty medication" that had the potential of causing "neuropsychotic episodes." BSC stated that he had not seen CC for more than four years. DFS considered the possibility of placing CC with BSC in New Mexico and requested that New Mexico authorities perform a home study upon BSC under the Interstate Compact for Placement of Children. The State of New Mexico advised DFS that it could not perform a home study upon BSC because their policies prohibited conducting studies upon anyone who has committed a sexual offense against a minor. DFS continued to work with BSC and provided BSC with opportunities to participate in meetings to determine CC's future, but he failed to do so.
[¶ 7] DFS filed petitions to terminate JC's and BSC's parental rights to CC. The petition listed the following bases for termination of BSC's parental rights to CC: 1) CC was abused and neglected, rehabilitation efforts were unsuccessful, and the health and safety of CC would be seriously jeopardized by returning him to BSC pursuant to Wyo. Stat. Ann. § 14-2-309(a)(iii); 2) CC had been in foster care under the responsibility of the State of Wyoming for fifteen (15) out of the most recent twenty-two (22) months and BSC was unfit to have custody and control of CC pursuant to Wyo. Stat. Ann. § 14-2-309(a)(v); 3) CC was left in the care of another person without provision for the child's support and without communication from BSC for at least one year pursuant to Wyo. Stat. Ann. § 14-2-309(a)(i); 4) other aggravating circumstances existed which indicated that there was little likelihood that services to the family would result in successful reunification pursuant to Wyo. Stat. Ann. § 14-2-309(c)(iii). A guardian ad litem was appointed to represent CC, and BSC was served with the petition on August 11, 2003. BSC filed a pro se response and motion to dismiss the petition.
[¶ 8] A termination hearing commenced on September 23, 2003. At the beginning of the hearing, BSC verbally asked the district court to appoint an attorney to represent him in the matter. He also requested a continuance, stating that he was unable to participate in the hearing because he was heavily medicated. The district court refused to appoint an attorney to represent him and denied his request for a continuance. The district court heard the evidence and issued a decision terminating JC's and BSC's parental rights to CC. JC did not contest the district court's decision, but BSC appealed from the district court's decision.

DISCUSSION
[¶ 9] After reviewing the parties' briefs, we conclude that there are four substantive issues in this case: 1) Whether the district court erred by refusing to appoint counsel to represent BSC at the termination proceedings; 2) whether the district court erred by refusing to continue the hearing because BSC was taking medication; 3) whether there was substantial evidence to terminate BSC's parental rights; and 4) whether the state failed to follow its own rules and regulations and, if so, whether that failure prejudiced BSC.

A. Standard of Review

[¶ 10] Each of these issues must be evaluated keeping in mind the principle that parental rights are fundamental in nature. See, e.g., RS v. Dep't of Family Services, 2004 WY 87, ¶ 11, 94 P.3d 1025, ¶ 11 (Wyo.2004); Lassiter v. Dep't of Social Services of Durham County, North Carolina, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159-60, 68 L.Ed.2d 640 (1981). The United States Supreme Court has stated:

*894 This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to "the companionship, care, custody and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection."
Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159-60 (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)).
[¶ 11] In recognition of the importance of the fundamental right of parents to associate with their children, we have adopted the following standard of review for parental termination actions:
Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. TR v. Washakie Cty. Dep't of Pub. Assistance & Soc. Servs., 736 P.2d 712, 715 (Wyo.1987). As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Wyo. Stat. Ann. § 14-2-309(a) (Michie 1997); In Interest of JG, 742 P.2d 770, 773 (Wyo.1987); D.S. v. Dep't of Pub. Assistance & Soc. Servs., 607 P.2d 911, 919 (Wyo.1980). Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. Matter of GP, 679 P.2d 976, 982 (Wyo.1984). Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. Matter of SYM, 924 P.2d 985, 987 (Wyo.1996). Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. Id.; D.S. v. Dep't of Pub. Assistance & Soc. Servs., 607 P.2d at 919-20; In Interest of JG, 742 P.2d at 773.
SD v. Carbon Cty. Dep't of Family Servs., 2002 WY 168, ¶ 5, 57 P.3d 1235, ¶ 5 (Wyo.2002) (quoting In re ZKP, 979 P.2d 953, 956 (Wyo.1999)). See also TOC v. TND, 2002 WY 76, ¶¶ 9, 10, 46 P.3d 863, ¶¶ 9, 10 (Wyo.2002); EBH v. Hot Springs Dep't of Family Servs., 2001 WY 100, ¶ 14, 33 P.3d 172, ¶ 14 (Wyo.2001).

B. Appointment of Attorney

[¶ 12] BSC claims that the district court erred by refusing to appoint an attorney to represent him at the termination hearing. Section 14-2-318(a) provides authority for the district court to appoint counsel for a parent in a termination proceeding. That statute states, in pertinent part: "The court may appoint counsel for any party who is indigent. Indigency shall be established by written affidavit signed and sworn to by the party or sworn testimony made a part of the record of the proceedings." Wyo. Stat. Ann. § 14-2-318(a) (LexisNexis 2003) (emphasis added).
[¶ 13] BSC's request for counsel came at the eleventh hour  after all the parties and witnesses had appeared at the district court for the hearing. The district court reviewed the record and concluded that BSC had not filed an affidavit of indigency in the termination proceeding. The court also noted that, although BSC had filed a response to the State's petition to terminate his parental rights and a motion to dismiss on his own behalf in the weeks prior to the hearing, he did not request an attorney. The court then ruled that his request for an attorney was untimely and denied BSC's request for counsel.
[¶ 14] In the Interest of KMM, 957 P.2d 296 (Wyo.1998), addressed a similar situation. In that case, the father complained on appeal about the district court's failure to appoint an attorney to represent him at the termination hearing. Id. at 297. We noted that, while pro se litigants are entitled to some leniency, "the proper administration of justice requires reasonable adherence to the rules and requirements of the court." Id. at 298. Nevertheless, we ruled that, because the father in KMM did not file a proper motion for appointment of counsel, he could not complain about his lack of counsel. Id. We noted, in particular, that "[t]he fact that the *895 father filed several motions in this case convinces us that his failure to file a motion for a court appointed attorney was not the result of his inability to understand the procedural requirement[.]" Id.
[¶ 15] In the case at hand, BSC's request was substantively deficient because he did not establish his indigency by affidavit or other sworn testimony. Moreover, his request was untimely. He had taken it upon himself to file other pre-trial motions and, yet, he did not request an attorney until the hearing had commenced. Thus, we are convinced in this case that BSC, like the father in KMM, was aware of the procedural requirements for appointment of an attorney. The district court, therefore, properly exercised its discretion under § 14-2-318(a) in denying BSC's request for counsel.
[¶ 16] Our ruling on the statute does not, however, end our inquiry. The question of whether or not BSC was entitled to have an attorney appointed to represent him at the termination hearing must also be addressed in the context of the constitutional rights of a parent. "Due to the fundamental nature of the rights affected by a termination action, the procedures involved must satisfy due process." RHF v. RMC, 774 P.2d 624, 628 (Wyo.1989). See also LP v. Natrona Cty. Dep't of Public Assistance and Social Servs., 679 P.2d 976 (Wyo.1984). The United States Supreme Court has stated that "fundamental fairness may be maintained in parental rights termination proceedings even when some procedures are mandated only on a case-by-case basis, rather than through rules of general application." Santosky v. Kramer, 455 U.S. 745, 757, 102 S.Ct. 1388, 1396, 71 L.Ed.2d 599 (1982).
[¶ 17] The United States Supreme Court specifically addressed the issue of whether an indigent parent is entitled to be represented by counsel at a termination of parental rights proceeding in Lassiter, supra. That Court ruled that, when the parent's physical personal liberty is not in jeopardy in a parental termination proceeding, appointment of counsel is not required in all instances. Lassiter, 452 U.S. at 26, 101 S.Ct. at 2159. Instead, the factors identified in Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), must be evaluated in determining whether due process mandates that counsel should be appointed in a particular case. Three elements should be taken into account: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159.
[¶ 18] In weighing the Eldridge factors in parental termination cases, in general, the United States Supreme Court remarked that, because the parent-child relationship is fundamental in nature, termination of that relationship works "a unique kind of deprivation." Lassiter, 452 U.S. at 27, 101 S.Ct. at 2160. Consequently, a parent's interest in the accuracy and justness of the decision is "commanding." Id. On the other side of the scale, the government has "an urgent interest in the welfare of the child, [and, therefore,] shares the parent's interest in an accurate and just decision." Id. The Supreme Court recognized that the availability of appointed counsel may serve both interests by increasing the efficacy of the adversarial system, which presumes that "accurate and just results are most likely obtained through the equal contest of opposed interests." Id. at 28, 101 S.Ct. at 2160.
[¶ 19] The United States Supreme Court also recognized that the government has an economic interest in avoiding the expense of appointed counsel for the parent and "the cost of the lengthened proceedings" the appointed attorney may cause. Id. The Supreme Court stated, however, that "though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests" involved in parental termination cases and, for that matter, the cost is de minimus compared to the costs of appointed counsel in criminal action. Id.
[¶ 20] Finally, the Supreme Court considered the risk that a parent could be erroneously deprived of his child because the parent was not represented by counsel. Id. In weighing that issue, the Court should look at the complexity of the issues involved in the particular parental rights termination case. Id. at 30, 101 S.Ct. at 2161. When expert medical or psychiatric testimony is implicated, *896 the need for appointed counsel is, obviously, greater. Id. In addition, the sophistication of the parent must also be taken into account. Id. The United States Supreme Court summarized its conclusions about an indigent parent's right to counsel in a parental right termination case as follows:
the parent's interest is an extremely important one ...; the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.
If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the Eldridge factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the Eldridge factors will not always be so distributed, and since, "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed," Gagnon v. Scarpelli, 411 U.S. [778] at 788, 93 S.Ct. [1756] at 1762 [36 L.Ed.2d 656] [(1973)], neither can we say that the Constitution requires the appointment of counsel at every parental termination proceeding. We, therefore, adopt the standard found appropriate in Gagnon v. Scarpelli, and leave the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review.
Lassiter, 452 U.S. at 31-32, 101 S.Ct. at 2161-62. After having reached the conclusion that the determination of whether an indigent parent is entitled to appointed counsel should be made on a case-by-case basis, the Supreme Court applied the Eldridge factors to the specific facts of the Lassiter case, and concluded that the indigent parent was not entitled to appointed counsel in that case. Id. at 32-33, 101 S.Ct. at 2162-63.
[¶ 21] Turning to the case at bar, we note that there is no indication in the record that BSC would face any new or separate criminal consequences as a result of his neglect or abuse of CC. Since his personal liberty was not threatened, he did not have an automatic right to counsel at the termination hearing. See Lassiter, 452 U.S. at 26, 101 S.Ct. at 2159; Scott v. Illinois, 440 U.S. 367, 373, 99 S.Ct. 1158, 1162, 59 L.Ed.2d 383 (1979). Following the guidance of the United States Supreme Court in Lassiter, we must, therefore, consider the specific facts of the case at bar in light of the Eldridge factors to determine whether the district court denied BSC due process of law when it refused to appoint counsel to represent him at the termination hearing. As in all parental termination proceedings, BSC's interests in maintaining his familial relationship with CC and in assuring that the decision is just and accurate are great. On the other hand, the State obviously has a strong interest in CC's welfare. Considering CC's special needs and the long period of time his familial status has been unsettled, the State had an interest in a final resolution of the matter. If the district court had decided to appoint counsel for BSC, the hearing would have had to be continued until a later date  further delaying a permanent placement for CC.
[¶ 22] The matters for deliberation at the parental termination proceeding were not complex. No expert testimony was offered at the hearing. The issues relied upon by the State to justify termination of parental rights were fairly simple. They included the amount of time CC had been in foster care, the length of the period of non-communication between BSC and CC, and BSC's failure to provide financial support for CC. The other issue considered at the termination hearing was BSC's fitness as a parent in light of his past treatment of CC and his criminal conviction for having sexual contact with a minor. Obviously, an attorney may have addressed some of the more technical aspects of the evidence better than BSC did. Nevertheless, considering the relative simplicity of the issues at the hearing, we believe that the *897 issues were adequately addressed at the hearing, even though BSC was not represented by counsel. Weighing all of the factors together, we conclude that BSC's due process rights were not violated when the district court refused to appoint counsel to represent him at the termination proceeding.

C. BSC's Use of Medication

[¶ 23] BSC argues that the district court erred by refusing to continue the hearing because he was taking prescription drugs at the time of the hearing.
"This Court has consistently held that the granting of a motion for continuance is within the discretion of the trial court. The standard of review, therefore, is limited to determining whether the trial court abused its discretion by denying the continuance."
Roose v. State, 753 P.2d 574, 578 (Wyo.1988) (quoting Gentry v. State, 724 P.2d 450, 451 (Wyo.1986)). See also Cardenas v. State, 811 P.2d 989, 994 (Wyo.1991).
[¶ 24] At the beginning of the termination hearing, BSC requested a continuance on the basis that he was "heavily, heavily medicated for one thing and cannot deal with manipulation." In response to BSC's verbal request for a continuation, the district court stated: "I do want to understand exactly what kind of circumstances we have with respect to any kinds of inability to understand or comprehend these proceedings." BSC responded: "I have no inability to understand or comprehend. I have a problem with being able to respond in a timely fashion. I will remember 90 percent of the proceeding, maybe, by the time I get to New Mexico."
[¶ 25] The district court reviewed the medications that BSC was taking and a transcript of a December 30, 2002, proceeding in a juvenile matter in which BSC represented himself. The court noted that BSC had been taking the same medications during that prior proceeding. The court stated:
Based upon the circumstances with respect to [BSC's] prescriptions and medications, I have reviewed the transcript from proceedings conducted in December 30, 2002, a time period at which time [BSC] would have been ingesting his prescription medication and has indicated to the Court that he has done so since June of 2001 in one case and September of 2001 in the other.
I have reviewed the transcript and particularly I have noted carefully the responses of [BSC] to the Court, as well as the responses to questions and arguments that he presented. Based upon that transcript, it does not appear to this Court that he has any difficulty in understanding or comprehending or meaningfully participating in that proceeding; and there's no indication in that proceeding, at which time he was taking the medication, that he has any difficulty.
In addition, [BSC] had been aware of this proceeding well in advance of two weeks. Actually, specifically, the notice was sent out on September 10, 2003. [BSC] was aware of his need to take medication. And has been familiar with the Court processes; and, in fact, on September 11th had filed his Response and Motion to Dismiss, in which he does not indicate any difficulty in comprehending or understanding the issues before the Court today or at that time.
Based upon that, as well as based upon the fact that we are here to begin this proceeding with the State prepared to call the witnesses to support its petition and [BSC's] prior knowledge of his medication uses, I don't see any evidence to suggest to me difficulty in comprehending or participating meaningfully in this process. And for those reasons, I will decline to continue this matter at this time.
[¶ 26] The district court conducted a comprehensive review of BSC's concerns about his ability to participate in the hearing in light of his medication use. BSC acknowledged that he was taking the same medication as he had been when he represented himself at the December 30, 2002, hearing. BSC did not provide any evidence which suggested that he was suffering from greater impairment at the September 2003 hearing than he was as the December 2002 hearing.
[¶ 27] Moreover, the timing of BSC's request for a continuance is suspect. BSC was *898 aware of his purported impairment prior to the hearing, but he did not address the issues in his pretrial submissions. Instead, he waited until the hearing had commenced to request the continuance on the basis of his medication use. BSC's request for a continuance seems to have been a tactic for delaying the hearing and, consequently, the final determination of CC's future. We conclude, therefore, that the district court did not abuse its discretion by denying BSC's request for a continuance.

D. Sufficiency of the Evidence

[¶ 28] Although BSC does not present this issue in a structured argument, he does, in numerous places in his brief, question the sufficiency of the evidence to support the district court's determination that his parental rights to CC should be terminated. The district court found that there was clear and convincing evidence to terminate parental rights under Wyo. Stat. Ann. § 14-2-309. In particular, the district court ruled that BSC's parental rights should be terminated because: 1) CC was left in the care and custody of another person, without provision for the child's support and without communication from the absent parent for a period of least one year; 2) CC had been left in foster care under the responsibility of the State of Wyoming for at least fifteen of the most recent twenty-two months and that BSC was unfit to have custody and control of CC; and 3) aggravating circumstances existed which indicate that there was little likelihood that services to the family would result in successful reunification. Although the State had also alleged that termination was appropriate because CC had been abused and neglected, the district court found it unnecessary to address that basis for termination in light of the fact that each of its prior rulings was sufficient to justify termination.
[¶ 29] Section 14-2-309 sets forth several independent bases for termination of parental rights. That statute states, in pertinent part:
(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
(i) The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications;
* * * *
(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;
* * * *
(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child;
* * * *
(c) Notwithstanding any other provision of this section, evidence that reasonable efforts have been made to preserve and reunify the family is not required in any case in which the court determines by clear and convincing evidence that:
* * * *
(iii) Other aggravating circumstances exist indicating that there is little likelihood that services to the family will result in successful reunification.
Wyo. Stat. Ann. § 14-2-309 (LexisNexis 2003).
[¶ 30] BSC left CC with the MM family in February 1998 and has not seen him since. Between December of 1998 and the termination hearing, there was no substantive communication between BSC and CC. In fact, even after being notified that CC was in DFS custody, he made only one effort to communicate with CC by sending a teddy bear and card. Thus, the evidence clearly showed that BSC has not had any true communication with CC in more than four years. When BSC left CC with the MM family, he *899 left some personal property and directed them to sell it to pay for CC's care. Since that time, BSC has not provided any other financial support for CC. Although BSC argued at the termination hearing that he informed DFS he was disabled and directed the agency to apply for Social Security benefits for CC, DFS denied that assertion and BSC did not submit any evidence to corroborate his position. Thus, there was clear and convincing evidence presented at the termination hearing to support the district court's conclusion that, under § 14-2-309(a)(i), CC had been left in the care of another person without provision for his support and without communication from BSC for a period of at least one (1) year.
[¶ 31] Turning to subsection (a)(v), the record is clear that JC placed CC in foster care under the authority of the State of Wyoming in January 2002. Therefore, at the time of the termination hearing, CC had been in the state's care for twenty of the last twenty-two months. With regard to the question of whether BSC was unfit to have care and custody of CC, we agree with the district court's analysis and defer to its evaluation of BSC at the termination hearing:
As a preliminary matter, [BSC]'s physical condition and current treatment cause this Court great concern as to the ability to care for any child, let alone one with the needs of [CC]. [BSC] is disabled, is not known to have any employment and has limited income, which he could not spare for contributing to [CC]'s care once he learned where [CC] was. [BSC]'s past treatment of [CC] leaving him with [the MM family] and failing to make any arrangements for his care and well being despite the initial problems in 1996, cause this Court to question his judgment. Furthermore, [BSC] was convicted of sexual contact with a minor, [CC]'s step-brother. In addition, while a deferred sentence, [BSC] was involved in similar crimes in Texas. Given this history [BSC] is unfit to have custody and control of [CC]. Aside from these hard facts, the demeanor and observations made of [BSC] by this Court during this hearing cause me grave concern as to [CC]'s safety if [BSC] was given custody and control. This, combined with the physical and emotional needs of [CC], demonstrate by clear and convincing evidence that [BSC] is unfit to have custody and control.
Clear and convincing evidence existed, therefore, to support the district court's conclusion that BSC's parental rights should be terminated pursuant to § 14-2-309(a)(v).
[¶ 32] Although there were other reasons asserted by the State and considered by the district court, we do not feel compelled to belabor our analysis of this issue. There is simply no question in this case that BSC's parental rights to CC should be terminated.

E. DFS Violations of Law

[¶ 33] BSC argues that the district court's decision should be reversed because DFS violated Wyoming law in several ways. In particular, he contends that DFS failed to comply with various Wyoming statutes and DFS rules and regulations by not notifying him, the district attorney, and the district court when it took CC into custody. He suggests that DFS's alleged violations of law prevented him from communicating with, and providing support to, CC.
[¶ 34] As we have stated in prior cases, an agency must follow Wyoming law and its own rules and regulations. See, e.g., MN v. State of Wyoming, Dep't of Family Servs., 2003 WY 135, ¶ 35, 78 P.3d 232, ¶ 35 (Wyo.2003); DH v. Wyoming Dep't of Family Servs., 2003 WY 155, ¶ 25, 79 P.3d 997, ¶ 25 (Wyo.2003). Although BSC quotes numerous state statutes and rules, he does not provide cogent legal analysis to support his contentions that DFS failed to comply with its legal requirements. See DH, at ¶ 23. "The mere showing that a statute or court rule has been breached, without more, does not establish cause for this Court to overturn the findings and conclusions of a trial court after a bench trial." Id.
[¶ 35] Furthermore, BSC's complaints ring hollow when analyzed in the context of his actions. Even after he was notified of CC's circumstances, he made only one effort to communicate with CC by sending a teddy bear and card. By the time he made that *900 effort, CC did not have any recollection of BSC as either his father or as an acquaintance. In addition, BSC did not provide any financial support for CC's care. He blames DFS and the guardian ad litem for failing to apply for Social Security benefits for CC, but we are not impressed with his efforts to transfer the responsibility for his child to others. It is the obligation of a parent to make sure that his children are adequately cared for at all times, and the fault for his failure to do so cannot be shifted to others.
[¶ 36] Affirmed.