2001 WY 100

## In the Matter of the TERMINATION OF PARENTAL RIGHTS TO IH, Minor Child:

EBH, Appellant (Respondent),

v.

Hot Springs Department of Family Services, Appellee (Petitioner).

No. C–00–12.

Supreme Court of Wyoming.

Oct. 18, 2001.

Representing Appellant: Thomas L. Burnside of Burnside Law Office, Cody, WY. Argument by Mr. Burnside.

Representing Appellee: Gay Woodhouse, Attorney General; Michael L. Hubbard, Deputy Attorney General; and Dan Wilde, Senior Assistant Attorney General. Argument by Mr. Wilde.

Guardian Ad Litem: Mary L. Scheible, Thermopolis, WY.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] EBH appeals a district court order terminating his parental rights. We conclude that the district court's decision was supported by clear and convincing evidence, and EBH was provided with due process. Accordingly, the district court's decision terminating EBH's parental rights is affirmed.

[¶ 2] Appellant EBH sets out four issues for consideration:

1. Did the District Court err when it terminated [EBH's] parental rights when the petition to terminate parental rights did not contain incidents of abuse or neglect by [EBH] and the termination relied on lack of support and lack of communication theories?

2. Was [EBH] denied due process when the Wyoming Department of Family Services failed to provide a clear statement of the consequences of [EBH's] failure to bring a child support obligation current?

3. Was [EBH] denied due process when the Wyoming Department of Family Services did not inform [EBH] of its decision to change the goal of family reunification to long term foster care or adoption?

4. Did the Wyoming Department of Family Services fail to follow its own rules when the agency changed its goal from family reunification to long term foster care/adoption without informing [EBH] and when the agency did not seek alternative foster placement in [EBH's] state of residence in Idaho?

The Department of Family Services (DFS) condenses the matter to a single issue:

Whether the district court's finding that appellant's parental rights to IH should be terminated was established by clear and convincing evidence?

**FACTS**

[¶ 3] The Petition to Terminate Parental Rights was filed on August 13, 1998. The State's petition alleged three grounds for termination:

10. That both children are neglected by [CP] and [EBH] and efforts by the Wyoming Department of Family Services have been unsuccessful in rehabilitating the family and/or [CP] and [EBH] have refused rehabilitation treatment by failing to comply with the Juvenile Court Multi–Disciplinary Assessment Team's recommendations to comply with requirements contained within the Juvenile Court Order.

11. That both children have been left in the care of another person, i.e., the Wyoming Department of Family Services, without provision for the children's support and without communication from the absent parent for a period of at least one (1) year, disregarding incidental contacts.

. . . .

15. That [the children] have been in foster care for 22 of the last 22 months.

A four-day bench trial on the petition was held from December 13–16, 1999. The State presented evidence through DFS employees and caseworkers, the Idaho caseworker who completed the 1999 home study, and two of IH's teachers. The State also offered the deposition testimony of the psychologist who evaluated the children and their parents in 1995, along with the reports detailing those evaluations.[1] EBH countered with evidence from an expert psychology witness and his own testimony.

[¶ 4] In 1991, EBH and CP had a son, IH. CP also had a daughter from another relationship.[2] In April of 1995, CP moved

---

1. The psychologist was unavailable to testify at the time of the hearing having accepted a position at a university in Cairo, Egypt.

2. CP's parental rights to both her children were also subject to the termination proceedings below. CP did not cooperate with her court-appointed attorney or appear at the hearing to contest the termination of her parental rights. CP has not appealed the district court's decision terminating her parental rights, and EBH had no legal parental rights vis-à-vis CP's daughter. This appeal is, therefore, only concerned with EBH's rights in relation to his biologic son, IH.

from Boise, Idaho to Thermopolis, Wyoming with her daughter and son. In May, the Department of Family Services began investigating reports of neglect and lack of supervision. The reports alleged that CP was leaving the children alone in her apartment and having someone drop by to check on them. CP would also leave her children with neighbors and disappear for long periods of time. At the time, CP was drinking heavily. On June 2, 1995, CP was placed in emergency detention after threatening suicide. On June 10, CP was arrested for public intoxication. Her arrest led to the discovery that CP had left the children with an intoxicated acquaintance. The children were taken into protective custody that evening and placed with a foster family. Based on the events of June 10, DFS substantiated general neglect on June 12.

[¶ 5] On September 27, 1995, DFS substantiated psychological and emotional neglect of the children.[3] The substantiation was based on the case history and a psychological evaluation of the children and their parents. The psychologist who examined IH concluded that he was "a severely delayed, presently Mildly Mentally Retarded youngster with especially profound expressive language and verbal reasoning skill deficits, who appears to come from a background deficient in basic psychosocial nurturance and academically-related and intellectually-related stimulation." The psychologist warned:

> Without intensive remediation for his developmental delays and his psychosocial deficits coupled with intensive family intervention to restore him to some form of safe, stable, consistent household environment, this youngster will grow up to have grave, even debilitating adaptive or life-skill deficits, and may well be on his way already to developing an abusive, explosive or excessively aggressive and dysfunctional personality style.

IH's preschool teacher noted that he would approach total strangers, hug them, and tell them that he loved them. Later, the Director of Special Services for Hot Springs School District No. 1 indicated that IH's cognitive abilities and IQ scores had improved substantially by 1998.

[¶ 6] IH's father, EBH, has a long history of criminal activity, including convictions for grand larceny, first degree burglary, and domestic violence. EBH also has an extensive history of abusing drugs, including alcohol, marijuana, and methamphetamine. The State's psychiatrist examined EBH shortly after IH was taken into protective custody in 1995 and reached the following conclusions:

> The results of this evaluation suggested [EBH] to be a grossly disturbed, characterologically fixated man of average overall intellect who may have signs of clinical hyperthyroidism, but more likely suffers from the residual affects [sic] of long-term injectable amphetamine abuse—with a strong hint of dependency continuing into the future ... [.] ... [H]e appears to be grossly self-centered and grandiose in his self-assessments, to be highly unrealistic in terms of evaluating himself as a social entity, and to have the marks of primary psychopathy that often are found in convict populations ... [.] ... There appear to be several areas of functional deficit for this gentleman that could gravely interfere with his ability to serve as a proper, facilitative, optimally-healthy parent figure: his odd, schizotypal thinking and interactive style; his vulnerability to resumed amphetamine abuse; his vulnerability to resumed criminality (and consequent possible return to prison); his history of failure to comply with probation, leading again to a return to prison on several occasions; and most immediately, his admitted discomfort in discharging the parenting duties of a single male parent for a toddler.

> This examiner could not in good conscience recommend this gentleman as the primary custodial parent at this point.

The State's psychiatrist suggested a long-term treatment plan for EBH that included

---

**3.** The record indicates that a "shelter care" hearing was held based on the substantiations of neglect. *See* Wyo. Stat. Ann. §§ 14–3–401 *et seq.* (LexisNexis 2001). The record does not reveal the results of that hearing. However, since the children have remained continuously in the custody of the State since June 10, 1995, we assume that the children were adjudged neglected at that time. *See* Wyo. Stat. Ann. § 14–3–429 (LexisNexis 2001).

intensive psychotherapy for his psychopathy and narcissism, medical treatment for his hyperthyroidism, and drug treatment including random testing.

[¶ 7] A multidisciplinary assessment team (MAT or team) was assembled consisting of various DFS personnel, the children's parents, EBH and CP, a school and mental health representative, and a guardian ad litem. The MAT set forth goals and objectives with the stated aim of reuniting IH and his sister with their parents. The team identified several issues EBH would have to address to facilitate the return of his son: EBH was to remain sober and drug-free, regularly attend alcohol/drug counseling and submit to random testing, establish and maintain a permanent residence, attend parenting classes, and pay child support.

[¶ 8] Although EBH traveled from Boise to Thermopolis immediately after IH was taken into protective custody in June of 1995, EBH's cooperation and compliance with the MAT directives was sporadic to non-existent over the next four years. EBH never voluntarily made a child support payment.[4] He attended one parenting class and received low marks for participation. At one point, EBH was evaluated by a substance abuse center. The MAT plans specifically required EBH to grant a release to DFS for the results of his examination; however, EBH rescinded the release and refused DFS access to the results of the examination. EBH did begin to receive professional counseling in October of 1999, just prior to the termination hearing in December. In addition, EBH failed to establish a stable address, moving several times between various residences in Idaho and Washington during this period.

[¶ 9] Initially, EBH maintained contact with IH and his sister. During 1995, EBH traveled from Idaho to Thermopolis to make in-person visits on eight occasions. In 1996 from January to July, EBH had twelve telephone visits and three in-person visits. On July 22, 1996, EBH was late for a scheduled telephone visit, and the children refused to take his call. On July 25, all visitations between EBH and the children were stopped by court order for 90 days. The non-visitation period was ended early on October 16, 1996, and EBH was informed that he could begin letter contact. Nevertheless, once his visitation rights were restored, EBH did not contact IH until November 10, 1998. Earlier in April 1998, DFS even offered to pay for transportation to bring EBH to Thermopolis. EBH never accepted the offer. From November 10, 1998, until the filing of the petition to terminate his parental rights in August of 1999, EBH had four telephone visits and one in-person visit. EBH did send Christmas and birthday gifts for IH in January of 1999. He also sent a valentine, an Easter gift, and a package between February and April of 1999. In November of 1999, the court stopped all in-person visitations because of violent and destructive behavior by IH that manifested itself after visitations with EBH.

[¶ 10] DFS attempted several home studies in order to determine whether it was feasible and appropriate to place IH with his father or other relatives in Idaho. The first two home studies were not completed. EBH objected to a planned home study on CP's sister because of her alleged drug usage and dealing at the residence. On another occasion, EBH refused to give his home address to the Idaho authorities, preventing them from conducting a home study. Ultimately, a home study was completed by the Idaho Department of Health and Welfare on December 3, 1999, just prior to the termination hearing. At the time of that study, EBH had entered into a relationship with SR, which would culminate in their marriage. SR had six children of her own from previous relationships, and four of the children resided with her and EBH at the time of the study. EBH indicated that SR would be the primary caregiver if IH came to live with them. The report noted that SR had an extensive child protection record in Idaho with 23 referrals, 20 of which resulted in investigations. There have been at least five substantiated referrals of SR relating to lack of supervision and neglect. Idaho refused to recommend IH's

---

4. After the petition for termination was filed, EBH asked DFS if his child support arrearage could be waived if he would relinquish his parental rights. He was informed that it could not be.

placement with EBH and SR because of "significant concerns for the well being of [IH] if placed with [EBH]."

[¶ 11] Dr. Charles Rice, EBH's expert, testified about EBH's personal and family history. He detailed EBH's alcoholism, drug usage, physical abuse and neglect on the part of his parents, prison time, and physical disabilities including dyslexia and hyperthyroidism. The expert concluded that EBH was "co-dependent" and was "poly substance" abuse dependent, in remission with antisocial behavior, and had obsessive-compulsive personality disorder traits with "avoidant and schizoid personality features." The expert also had a brief interview with IH and administered several basic psychological drawing tests. The interview and tests were limited to a determination of IH's perceptions of his father. Dr. Rice testified that IH had generally positive perceptions of his father.[5]

[¶ 12] In his testimony at the termination hearing, EBH admitted to using illegal drugs with IH's mother. However, EBH indicated that he had been drug-free for two years until a three- to four-month relapse in 1991. Except for another brief relapse in 1997, EBH claimed he had remained drug-free since the 1991 relapse. He also admitted to his criminal history and past incarcerations, including a parole violation resulting in ten months in a work release facility, when IH was two years old. Nevertheless, EBH opined that he could provide the appropriate level of care and a stable home environment for IH with his new wife and her children.

[¶ 13] The district court concluded that the State had proven each of its allegations by clear and convincing evidence, and that the termination of EBH's parental rights was in the best interests of IH, and granted the State's petition to terminate parental rights. EBH has now appealed that decision to this Court.

## STANDARD OF REVIEW

[¶ 14] Our standard for reviewing the grant of a petition to terminate parental rights was set forth in *In re JL,* 989 P.2d 1268, 1270–71 (Wyo.1999):

We have held that the right to associate with one's family is a fundamental liberty under both the United States Constitution and Article 1, Sections 2, 6, 7, and 36 of the Wyoming Constitution. *DS v. Department of Public Assistance and Social Services,* 607 P.2d 911, 918 (Wyo.1980). In *Matter of GP,* 679 P.2d 976, 982 (Wyo.1984) our standard of review was set forth as follows:

Strict scrutiny is the test which will be employed when balancing a fundamental right against a compelling state interest, which interest is, in this case, the welfare of the children. The compelling state interest having been established, it is necessary to prove that the method sought to achieve it is the least intrusive of those methods by which the state's interest can be fulfilled. *State in Interest of C,* Wyo., 638 P.2d 165 (1981) [citations omitted].

The evidence which will countenance a termination must be clear and convincing (§ 14–2–309(a), supra). We explained what we mean by "clear and convincing" evidence in *Thomasi v. Koch,* Wyo., 660 P.2d 806, 811–812 (1983), where we said:

"* * * This court previously has adopted language to this effect:

" '* * * When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and satisfactory.' *Continental Sheep Co. v. Woodhouse,* 71 Wyo. 194, 202, 256 P.2d 97 (1953), quoting language found in *Good Milking Mach. Co. v. Galloway,* 168 Iowa 550, 150 N.W. 710, 712 (1915).

"We further have said that clear and convincing evidence is 'that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.' *MacGuire v. Harriscope Broadcasting Co.,* Wyo., 612 P.2d 830, 839 (1980)."

---

5. Dr. Rice prepared a report based on his interview and tests with IH. The report was admitted into evidence but was not made a part of the record on appeal.

*See also Matter of ZKP,* 979 P.2d 953 (Wyo.1999). We accept as true the evidence of the successful party, leave out of consideration the evidence of the unsuccessful party in conflict therewith, and give the evidence of the successful party every favorable inference which may fairly and reasonably be drawn therefrom. *Id.; DS,* 607 P.2d at 918.

## DISCUSSION

[¶ 15] Wyoming's statute setting forth the grounds for termination of the legal parent-child relationship provides, in relevant part:

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

(i) The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications;

. . . .

(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

. . . .

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child.

Wyo. Stat. Ann. § 14–2–309(a)(i), (iii), and (v) (LexisNexis 2001). The State's allegations in support of the petition to terminate EBH's parental rights were based on all three of these grounds, although the statute requires clear and convincing proof of only one to effectuate termination. The district court found clear and convincing evidence to support termination on all three grounds. In his brief, EBH directly addresses the district court's decision only in regard to Wyo. Stat. Ann. § 14–2–309(a)(i), while implicitly arguing against the application of the other two grounds. Our review of the record, however, convinces us that clear and convincing evidence exists in support of the termination of EBH's parental rights to IH on all three grounds cited by the district court.

[¶ 16] EBH's argument against the district court's evidentiary conclusions in support of the decision to terminate parental rights consumes less than a single, double-spaced page of his brief. Specific to Wyo. Stat. Ann. § 14–2–309(a)(i), EBH contends that the statutory provision is inapplicable because he did not leave his child in the care of another and "[a]lthough, [EBH's] financial support and communication were sporadic, these elements were not precedent to leaving the children in the care of another person." Implicitly, EBH argues that there is no evidence that he personally neglected IH (Wyo. Stat.Ann. § 14–2–309(a)(iii)) or that he was an unfit parent (Wyo.Stat.Ann. § 14–2–309(a)(v)).

[¶ 17] We begin with EBH's argument that Wyo. Stat. Ann. § 14–2–309(a)(i) was inapplicable to his situation. Our resolution requires us to refer to our standards for interpreting statutory language:

[W]e look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. *Olheiser v. State ex rel. Worker's Compensation Div.,* 866 P.2d 768, 770 (Wyo.1994), citing *Parker Land & Cattle Co. v. Game & Fish Comm'n,* 845 P.2d 1040, 1042–43 (Wyo.1993). A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. *Parker Land & Cattle,* at 1043. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. *Id.* * * * Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court. *Id.*

. . . .

When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. *Tietema v. State*, 926 P.2d 952, 954 (Wyo.1996); *Butts v. State Board of Architects*, 911 P.2d 1062, 1065 (Wyo.1996). Instead, our inquiry revolves around the ordinary and obvious meaning of the words employed according to their arrangement and connection. In doing so, we view the statute as a whole in order to ascertain its intent and general purpose and also the meaning of each part. "We give effect to every word, clause and sentence and construe all components of a statute *in pari materia*." *Parker*, 845 P.2d at 1042.

*Murphy v. State Canvassing Board*, 12 P.3d 677, 679 (Wyo.2000) (citing *Campbell County School District v. Catchpole*, 6 P.3d 1275, 1284 (Wyo.2000)).

[¶ 18]  EBH's claim that he did not leave his child in the care of another—IH was taken from his estranged significant other, CP is irrelevant in reference to the plain language of Wyo. Stat. Ann. § 14–2–309(a)(i). The statute simply requires the child to have "been left in the care of another person[.]" There is no specification of fault or explanation for why the child has been left in the care of another person. The undisputed fact is that IH was left in the care of another person, DFS, not the absent parent. That is all the statute requires.

[¶ 19]  Next, we consider EBH's contention that his communication and support of the child, while sporadic, was not precedent to leaving the child in the care of another. Apparently, EBH is assuming that the failure to provide support and communication to the child is the **grounds** for having the child taken into the care of another and is arguing that he supported and communicated with his child prior to IH being taken into protective custody. This is an incorrect assumption under the plain language of the statute. The statute unambiguously uses the phrases, "The child has been left in the care of another person" and "without provision for

the child's support and without communication from the absent parent" with "for a period of at least one (1) year," to refer to contemporaneous conditions. In other words, the phrase, "for a period of at least one (1) year," applies to each of the three preceding elements of the statute. For termination to lie under this subsection, it must be demonstrated by clear and convincing evidence that the child has been in the care of another without provision for support or communication from the absent parent for one year. The statute is referring to a concurrent condition, not a precedent one.

[¶ 20]  As noted, we found clear and convincing evidence in the record to support all three of the grounds cited by the district court in granting the termination petition. We will review each of those grounds and the evidence in the record supporting the district court's conclusions. First, there is clear and convincing evidence supporting termination of EBH's parental rights pursuant to Wyo. Stat. Ann. § 14–2–309(a)(i). IH was in the care of DFS from the time he was taken into protective custody on June 10, 1995, through at least the dates of the termination hearing in December of 1999. The record clearly demonstrates that EBH went from October 16, 1996, until November 10, 1998, without having any contact whatsoever with IH. Further, EBH has never voluntarily paid a single cent in child support for IH despite court orders compelling him to do so.[6] These facts are uncontradicted in the record and constitute clear and convincing evidence for termination under § 14–2–309(a)(i).

[¶ 21]  Section 14–2–309(a)(iii), as it relates to the circumstances of this case, allows for termination of a parent-child relationship if it is shown by clear and convincing evidence that the child has been neglected, reasonable efforts to rehabilitate the family were unsuccessful or refused, and returning to the parent would seriously jeopardize the child's health and safety. "Neglect" with respect to a child under this subsection means:

---

6.  The only child support the State ever received for IH was from a single, involuntary tax inter-

cept on EBH's paycheck.

(vii) .... a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being.

Wyo. Stat. Ann. § 14–3–202(a)(vii) (Lexis-Nexis 2001). EBH argues that it was CP that neglected IH, and there is no evidence that he did. DFS substantiated neglect and lack of supervision on the part of CP that was the basis for the initial decision to take IH into protective custody. However, the record also shows that on September 27, 1995, DFS substantiated psychological and emotional neglect of the children that went beyond the initial basis for protective custody. As noted in the facts above, the psychological exam of IH revealed a child with profound language and verbal skill deficits and who was from a background deficient in basic psychological nurturance and academic and intellectual stimulation. The psychologist concluded from his examination of EBH that he had severe deficiencies that affected his ability to provide adequate care to IH, and it was recommended that EBH not be the primary custodial parent. Furthermore, IH had resided in the same household with his parents, EBH and CP, from his birth on January 3, 1991, until sometime in April of 1995. It is a reasonable inference to draw from these facts that IH's developmental, psychological and emotional deficiencies were the result of neglect on the part of both parents with whom the child had been living.

[¶ 22] EBH also failed to cooperate with attempts to rehabilitate the family unit. The conditions set forth by the MAT were designed to enhance EBH's parenting ability and to provide a safe, stable home environment for IH. EBH, however, consistently failed to cooperate with the MAT. EBH failed to: provide proof that he was not using drugs or alcohol, grant a release to DFS for the results of a substance abuse evaluation, establish a stable home and refusing on several occasions to provide DFS with his current address, and obtain professional counseling until October of 1999—four years after IH was taken into protective custody, over one year after the petition for termination had been filed and only two months before the hearing on the petition. The record clearly and convincingly establishes that the rehabilitative efforts were unsuccessful.

[¶ 23] Section 14–2–309(a)(iii) also requires a showing that the child's health and safety would be seriously jeopardized by a return to the parent. There is no question that IH was a significantly troubled child with special needs and care required when he was taken into protective custody. Testimony indicated that IH would react to visits with EBH with incidents of extreme violent behavior. The State's psychologist indicated in 1995 that EBH did not have the necessary parental skills to have custody of IH. The evidence in the record supports a conclusion that EBH had not acquired those necessary skills in the time between 1995 and the termination hearing in December of 1999. Indeed, all of the evidence indicates that placing IH with EBH would seriously jeopardize IH's health and safety. EBH planned to have IH live in Idaho with him and his new wife, SR, and her children. EBH indicated that SR would be IH's primary care giver. However, EBH's new wife has an extensive history of neglect and lack of supervision of her own children. The Idaho Department of Health and Welfare refused to recommend placement of IH in that household citing significant concerns relating to the well being of IH if placed into that circumstance. There is clear and convincing evidence that placement of IH with EBH would seriously jeopardize his health and safety.

[¶ 24] The third of the grounds cited by the district court in support of its decision terminating EBH's parental rights was Wyo. Stat. Ann. § 14–2–309(a)(v), which requires the child to have been in foster care under the responsibility of the State of Wyoming for 15 of the most recent 22 months and a showing that the parent is unfit to have custody and control of the child. IH has been in foster care under the responsibility of the State of Wyoming (DFS) continuously since he was taken into protective custody in June of 1995 through the termination hearing. For the reasons noted above, we also find that there is clear and convincing evi-

dence that EBH was unfit to have custody and control of IH.

[¶ 25] EBH raises three additional issues, two of which he characterizes as due process violations. First, he claims he was denied due process because DFS failed to provide a clear statement of the consequences for failure to bring child support arrears current. Second, he argues he was also denied due process because DFS failed to inform him that it was changing the goal of the process from family reunification to long-term foster care or adoption. Finally, EBH contends that DFS failed to follow its own rules when it did not seek alternative foster care placement of IH in Idaho. None of these issues were raised before the district court. Normally, we decline to address issues that are raised for the first time on appeal. *Cooper v. Town of Pinedale*, 1 P.3d 1197, 1208 (Wyo.2000). There are two exceptions to this rule: when the issue raises jurisdictional questions or when the issue is of such a fundamental nature that it must be considered. *Id.* Given the importance attached to a fundamental right like the parent-child relationship, we will give EBH the benefit of the doubt and briefly discuss each of the issues he has raised.

[¶ 26] In his first issue, EBH claims DFS failed to provide him with a clear statement relating the consequences of his failure to bring child support arrears current. He insists that this action denied him due process. In support of his position, EBH cites Wyo. Stat. Ann. § 1–22–110(b) (LexisNexis 2001), which provides:

> Any petition filed pursuant to paragraphs (a)(iv) or (ix) of this section shall contain a clear statement of the consequences of the respondent's failure to bring the support obligation current.

EBH acknowledges that the statute applies only to nonconsensual adoptions and not to termination proceedings. He suggests, however, that he is entitled to receive the same due process protections as those being subjected to a nonconsensual adoption.

[¶ 27] Our review of the record indicates that EBH received notice sufficient to make him aware that his failure to pay child support could lead to the termination of his parental rights. The MAT plan EBH signed in October of 1997 clearly states that failure to abide by the plan could result in long-term foster care for the child or termination of parental rights. Furthermore, the petition to notify was filed in August of 1998 and, as we noted above, one of the grounds cited for termination was the failure to pay child support. Between the date the petition was filed and the termination hearing in December 1999, DFS continued to attempt to rehabilitate the family. EBH had notice for almost 16 months prior to the termination hearing that his failure to make those payments would be one of the grounds for termination. Nevertheless, EBH chose not to make the requisite child support payments. We conclude that EBH had enough notice of what was required of him to satisfy due process considerations.[7]

[¶ 28] In his next issue, EBH complains that he was denied due process when DFS failed to inform him of the decision to change its goal from family reunification to long-term foster care or adoption. He argues that this change necessarily implies a determination to terminate his parental rights. EBH points out that the change occurred near the time that his visitation rights were restricted from July to October of 1996. While his brief is not clear, EBH seems to be suggesting that the timing of the no-contact period was designed to create "emotional distance" between him and his child without informing him of the consequences of not re-establishing contact with IH. Apparently, EBH is arguing that the no-contact period was part of a greater plan by DFS to force a termination of his parental rights.

[¶ 29] We are at a loss to completely understand EBH's position, but our review of the record suggests that there were no improprieties occasioned by DFS, and EBH was well aware of the change in the goals.

---

7. We also note that even if we had concluded EBH had not received proper notice, it would not affect the validity of the district court's termination of EBH's parental rights based on Wyo. Stat. Ann. §§ 14–2–309(a)(i) & (v).

The records of the MAT meetings show that EBH was in attendance, or appearing by phone, when the goals of the team were discussed. The team coordinators testified that EBH received notice of all meetings and received copies of the case plans. Furthermore, the no-contact period was not counted when assessing EBH's contacts with his child for purposes of Wyo. Stat. Ann. § 14–2–309(a)(iii). After the no-contact period expired, EBH had no contact with his child from October 16, 1996, until November 10, 1998. Nothing DFS did prevented EBH from contacting IH. In point of fact, DFS even offered in April of 1998 to pay for EBH's transportation to and from Thermopolis for the sole purpose of visiting his son. EBH never took up that offer. There comes a time when a person must accept responsibility for his own actions. Nobody but EBH is responsible for his lack of contact with his son.

[¶ 30] In his final issue, EBH argues that DFS failed to follow its own rules when it did not seek alternative foster care placement in EBH's home state of Idaho. EBH points to the Department of Family Services Division of Youth Services Child Protection Rules Chapter 3, Section 4(d)(iv), which states the "placement plan will include the following: ... Placement of the child in as close proximity to his home as possible." DFS considered placement of IH with his aunt in Boise. EBH objected to that action, however, based on the aunt's drug usage and dealing. EBH states that more of an effort to find appropriate foster placement in Idaho was required by DFS.

[¶ 31] We find little merit in EBH's argument. He fails to explain, if his allegation is true, how it affects the findings supporting the termination of his parental rights. Furthermore, the term "home" is not defined in the rules, but its ordinary meaning is defined as:

> One's own dwelling place; the house in which one lives, especially the house in which one lives with his family; the habitual abode of one's family; .... That place in which one in fact resides with the intention of residence, or in which he has so resided, and with regard to which he retains residence or to which he intends to return.

Black's Law Dictionary, Sixth Edition 733 (1990). The structure of the rule indicates that the reference to "home" is to the home of the only individual referenced therein the child. IH's home at the time he was taken into custody was in Thermopolis, not Boise. IH's mother resided in Thermopolis, albeit sporadically, for much of the time IH was in foster care, and he had other relatives in the area. EBH does not offer an explanation as to how the rule could apply to his home in Boise when the rule references the child's home. DFS was not under any obligation to seek placement of IH in foster care near EBH's residence, although the agency did seek placement there on at least three occasions. We cannot find any improper conduct on the part of DFS in handling IH's foster care placement.

**CONCLUSION**

[¶ 32] The district court's decision to terminate the parental rights of EBH to his son IH was supported by clear and convincing evidence. Since there is no other error in the proceedings below, the decision is affirmed.