2004 WY 87

**In the Matter of the Parental Rights to KLS, Minor Child:**

**RS, Appellant (Respondent),**

v.

**Department of Family Services, Sheridan County, Wyoming, Appellee (Petitioner).**

No. C–03–12.

Supreme Court of Wyoming.

July 22, 2004.

Representing Appellant: Robert W. Brown of Lonabaugh and Riggs, Sheridan, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Dan S. Wilde, Senior Assistant Attorney General; Robin Sessions Cooley, Deputy Attorney General; and Sue Chatfield, Assistant Attorney General.

Guardian ad litem: Jan K. Flaharty of Family Law Office, Sheridan, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] The Father of KLS, a minor child, appeals the district court's order terminating his parental rights claiming the Department of Family Services (DFS) failed to offer sufficient evidence of neglect at the time KLS was removed from his custody. Upon review of the record, which contains clear and convincing evidence of abuse and neglect over the child's lifetime, including evidence the father caused her to witness repeated episodes of domestic violence, we affirm.

## ISSUES

[¶ 2] The issues presented by Father are as follows:

· A. Whether [Father] neglected his child as that term is defined [by] Wyoming Statute.

B. Whether the Court may consider evidence of a guilty plea by [Father] in a separate matter entered after the close of evidence in this case.

C. Whether the evidence presented by the State through its witnesses in support of termination is credible in light of the fact that the State's witness, Nelinda Dahmke, mislead and made false statements to the District Court.

[¶ 3] DFS phrases the issue as follows:

Whether the district court's finding that [Father's] parental rights to KLS should be terminated was established by clear and convincing evidence?

## FACTS

[¶ 4] KLS was born October 28, 1999. While Father and Mother were not married at the time of KLS' birth, they lived together periodically after KLS was born. Father and Mother married briefly, but eventually divorced. Between October 1999 and January 2002, the couple moved in and out of at least twelve different residences in two states, which included houses, apartments, motels and homes of friends and family. Father and Mother physically and verbally abused each other, often in the presence of KLS. Mother filed for and received numerous family violence protection orders against Father over the course of their troubled relationship.

[¶ 5] On January 10, 2002, Mother left KLS in Sheridan with a babysitter, Misty Humphries. Four days later, on January 14, 2002, Ms. Humphries' sister Amanda contacted the DFS office in Sheridan to report that Mother had failed to pick up KLS as scheduled. As a result of the allegation that Mother had abandoned KLS, and after failed attempts to contact Mother and Father, DFS took KLS into protective custody pursuant to Wyo. Stat. Ann. § 14-3-405 (LexisNexis 2003).[1]

---

1. Wyo. Stat. Ann. § 14-3-405 (LexisNexis 2003). **"Taking of child into custody; when permitted.** (a) A child may be taken into custody by a law enforcement officer without a warrant or court order when: (i) There are reasonable grounds to believe a child is abandoned, lost, suffering from illness or injury or seriously endangered by his surroundings and immediate custody appears to be necessary for his protection; or (ii) The child's conduct or behavior seriously endangers himself and immediate custody appears necessary."

[¶ 6] The same day DFS took KLS into custody, it located Father and arranged for him to pick up KLS. DFS placed KLS with Father on the condition that KLS not have un-supervised contact with Mother and that Father keep DFS informed of KLS' whereabouts. On January 15, 2002, when DFS could not locate Father and KLS, it concluded Father had violated the conditions under which he was allowed custody. Thus, DFS retrieved KLS from Father and placed KLS in foster care.

[¶ 7] The district court entered an order for temporary protective custody on January 18, 2002, finding KLS' life or safety was in danger and continued placement in the family home would be contrary to KLS' wellbeing. KLS was to be placed in the protective legal and physical custody of DFS in accordance with the Child Protection Act, Wyo. Stat. Ann. § 14-3-401, et. seq. (LexisNexis 2003). Pursuant to the statute, a petition for neglect was filed in the district court sitting as the juvenile court. After a hearing on May 3, 2002, the court entered an order finding Mother had neglected KLS.[2] Consequently, the court ordered KLS to stay in the temporary custody of DFS until Father and Mother successfully completed the objectives identified in a case plan prepared by DFS.

[¶ 8] The ultimate goal of the case plan was family reunification. The specific objectives with which Mother and Father were required to comply were: (1) substance abuse evaluation and treatment/counseling to address addiction and/or use of methamphetamine, marijuana and alcohol; (2) counseling to address issues such as, but not limited to, relationships, parenting, effective appropriate communication, anger and control issues; (3) parenting classes; (4) pay child support for KLS; (5) submit to random UAs and breathalyzer tests; (6) establish paternity; (7) maintain contact with KLS; (8) secure and maintain adequate, consistent, and safe housing for a minimum of six consecutive months; and (9) secure and maintain employment for a minimum of six consecutive months. The case plan warned, "failure or refusal to suc-

cessfully complete the case plan for family reunification shall result in alternative permanency planning for said minor child, i.e. termination of parental rights followed by adoption."

[¶ 9] On June 18, 2002, DFS filed a petition in juvenile court against Mother and Father alleging contempt for failure to follow the case plan. At a hearing on the contempt petition, Mother admitted the allegations and Father failed to appear. On July 10, 2002, the juvenile court issued a bench warrant for Father's arrest regarding his failure to appear. On November 15, 2002, all juvenile proceedings were suspended when the juvenile court learned DFS had filed a petition for termination of parental rights in the district court.

[¶ 10] In the petition, DFS alleged Mother and Father failed to comply with rehabilitation services despite continued efforts by DFS, failed to comply with the case plan and, in turn, had neglected KLS. After a two day hearing, the district court terminated Mother and Father's parental rights in an order dated May 13, 2003. Father appeals that decision.

## STANDARD OF REVIEW

[¶ 11] Our standard of review for the granting of a petition to terminate parental rights is as follows:

Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. *TR v. Washakie County Dep't of Pub. Assistance & Soc. Servs.*, 736 P.2d 712, 715 (Wyo.1987). As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Wyo. Stat. Ann. § 14-2-309(a) (Michie 1997); *In Interest of JG*, 742 P.2d 770, 773 (Wyo.1987); *D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d 911, 919 (Wyo.1980). Clear and convincing evi-

---

2. The record does not contain transcripts of the neglect hearing, nor does it contain the original petition for neglect.

dence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *Matter of GP*, 679 P.2d 976, 982 (Wyo.1984). Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. *Matter of SYM*, 924 P.2d 985, 987 (Wyo.1996). Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. *Id.; D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d at 919–20; *In Interest of JG*, 742 P.2d at 773. *In Re ZKP*, 979 P.2d 953, 956 (Wyo.1999); see also *In Re IH*, 2001 WY 100, P14, 33 P.3d 172, P14 (Wyo.2001); *Matter of TLC*, 2002 WY 76, 46 P.3d 863 (Wyo.2002).

*SD v. Carbon County Dep't of Family Servs. (In re SED)*, 2002 WY 168, ¶ 5, 57 P.3d 1235, ¶ 5 (Wyo.2002).

## DISCUSSION

[¶ 12]Termination of parental rights pursuant to Wyo. Stat. Ann. § 14–2–309(a)(iii) (LexisNexis 2003) requires the establishment of three elements: (1) abusive treatment or neglect by the parent; (2) unsuccessful efforts to rehabilitate the family; and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent. Abuse and neglect are defined in Wyo. Stat. Ann. § 14–3–202(a)(ii) (LexisNexis 2003):

(ii) "Abuse" means inflicting or causing physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child other than by accidental means, including abandonment, unless the abandonment is a relinquishment substantially in accordance with W.S. 14–11–101 through 14–11–109, excessive or unreasonable corporal punishment, malnutrition or substantial risk thereof by reason of intentional or unintentional neglect, and the commission or allowing the commission of a sexual offense against a child as defined by law:

(A) "Mental injury" means an injury to the psychological capacity or emotional stability of a child as evidenced by an observable or substantial impairment in his ability to function within a normal range of performance and behavior with due regard to his culture;

(B) "Physical injury" means any harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising if greater in magnitude than minor bruising associated with reasonable corporal punishment, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition;

(C) "Substantial risk" means a strong possibility as contrasted with a remote or insignificant possibility;

(D) "Imminent danger" includes threatened harm and means a statement, overt act, condition or status, which represents an immediate and substantial risk of sexual abuse or physical or mental injury.

. . .

(vii) "Neglect" means a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or ay other care necessary for the child's well being.

[¶ 13] At the hearing on the petition to terminate parental rights, the State presented evidence through DFS employees and caseworkers, a counselor, and KLS' foster mother. Both Mother and Father testified, as did family members. Father denied he had neglected KLS. Instead, he offered testimony that on the morning of January 15, 2002, when KLS was taken from him after one day in his custody, KLS was healthy, well-fed, well-dressed and clean. The State produced evidence of Father's pattern of behavior throughout the child's short life, which included repeated incidences of domestic violence against Mother, often occurring in KLS' presence.

[¶ 14] The district court found that although "Wyoming Courts recognize the parent child relationship is one of the most precious rights," KLS was neglected by both parents when they subjected her to domestic violence, failed to follow the case plan, failed

to obtain consistent and adequate housing, and failed to visit KLS as often as allowed. Further, the court found that because of the parents' lack of cooperation, reasonable efforts by DFS were unsuccessful in rehabilitating either parent in an effort to reunify the family.

### Abuse and Neglect

[¶ 15] Because Father focuses on the sufficiency of the evidence of neglect, our discussion begins there. This Court has previously observed that there is a thin line between abuse and neglect and often an act or an incident may be evidence of both neglect and abuse. *MS v. Kuchera (In re MLM)*, 682 P.2d 982, 987 (Wyo.1984). Such was true in this case, and thus we view the evidence through the lenses of both, although only neglect was alleged by DFS.

[¶ 16] Father's argument relies on the one day he had full custody during which he claims he did not neglect KLS. However, in the termination of parental rights, we must consider all of the factors, incidents and conditions that demonstrate neglect. *MLM*, 682 P.2d at 988. Rarely do we find a single condition or incident standing alone justifies termination. Instead, neglect is usually manifested by numerous incidents and conditions extending over a considerable length of time. *Id.* One day without neglect does not overcome a lifetime of abusive and neglectful behavior.

[¶ 17] The record establishes clear and convincing evidence of a pattern of neglect by Father. He failed to provide KLS with a stable home as demonstrated by the sheer number of living situations. Of course, the lack of a stable home alone does not constitute abuse or neglect. However, in the specific context of these facts, it is a factor. In her short lifetime, Father shuffled KLS between twelve different residences in two different states. The family lived in a hotel and two houses in Colorado. Mother testified to living in three different places in Gillette, which included two apartments and a friend's home. Upon moving to Sheridan, Father moved KLS six times, mostly to different motels. As a result of the lack of a stable home, KLS was not given timely immunizations or follow-up medical care for illnesses.

[¶ 18] Father repeatedly subjected KLS to witnessing domestic violence between him and Mother. The statutory definition of neglect includes failure to provide adequate care and supervision and abuse is defined to include inflicting mental injury. Causing a child to witness violence and abuse of others is an appropriate consideration in determining whether a parent is guilty of neglect by failing to properly care for and supervise that child and of abuse by subjecting the child to mental and emotional injury. Father first struck Mother three days into their relationship. Father often pushed and hit Mother, as well as destroyed her property. Because of the frequency of reported incidents of domestic violence between the two parents, we can infer that it often occurred in KLS' presence. In addition, the record contains direct evidence of that fact on numerous occasions. In October 2000, law enforcement officers responded to a domestic dispute between Father and Mother, which occurred while KLS was present in her crib. On December 13, 2000, Mother filed a petition for a family violence protection order in Sheridan County Circuit Court. In her affidavit, she claimed Father pulled her out of bed by her hair, broke the bed, bathroom doors and mirror, and punched and kicked her. In March 2001, Mother filed another petition for a family violence protection order in Campbell County claiming Father pushed her down and tore the phone out of the wall. A few days later, while KLS was in the vehicle with him, Father tried to run Mother's vehicle off the road while yelling, "I'll kill you, you fucking bitch." In July 2001, law enforcement was called to a residence where Mother and Father were engaged in a domestic dispute while KLS was inside the house. Police were called again in October 2001 after Father and Mother (and Father's mother) got into an argument.

[¶ 19] Mother filed for and obtained yet another family violence protection order on November 13, 2001, stemming from an argument outside of the motel room where they were staying while KLS remained inside the room. Mother claimed Father grabbed her

by the neck, shook and choked her, then threatened he would kill her if she left. He then threw a bottle of alcohol at Mother's car as she left, breaking the window. Mother also indicated in her affidavit that the day before this incident, Father charged and choked her while she was holding KLS and said he would cut her head off and could not wait until she was dead. Mother testified that during the rest of the day two-year-old KLS repeated, "cut off Mommy's head", until Father apologized, at which time KLS started repeating "so fucking sorry." After the hearing on the last protection order, Father yelled, "You fucking bitch" to Mother as she was leaving the courtroom with KLS in her arms.

[¶ 20] Evidence of the effect on KLS of witnessing the violence between her parents came through the testimony of Sharyn Siler, a licensed clinical social worker. In October 2002, DFS retained Ms. Siler to examine and treat KLS. After approximately thirty-four sessions with KLS involving play, art therapy and discussions with Mother and KLS' foster mother, Ms. Siler diagnosed KLS with post-traumatic stress disorder (PTSD). Ms. Siler testified as follows:

[KLS] displays feelings of anxiety, fears. [KLS] worries about the safety of others. [KLS] can be very clingy to her caregiver. At other times she's more—as she gets used to the surroundings, she is more free and apart from. But she can be very clingy. She worries about recurrence of violence. This is not something that she has verbally said. I want to make that specific. This is what has come out through play therapy about how she displays—KLS is right now three years old, so much of her life has been preverbal stages; and she doesn't still right now have a lot of verbal skills to be able to explain things. So, this is through interpretation of play therapy.

There ha[ve] been changes in behavior throughout the time that she's been in foster care of withdrawal and then—first, she'll withdraw; and then she will become closer in the clinging part. She'll have outbursts of anger without any knowing, precipitating event that happened before.

She has in play therapy recreated events that display violence or anger between the toys that she's playing with, the toys that she's selected.

She has—she's hyper-vigilant, increased sensitivity to sound. If there's any noises in my office that she can't readily identify, if there's pipes or something going on, she will immediately stop what she's doing and ask what that is. At first she was fearful of that and after the explanations and she's getting used to it, but she still is very aware of any noises in the office.

Changes in sleep pattern, as explained——or as told to me by the foster mother, she has a difficult time falling asleep. She has a difficult time staying asleep once asleep. She prefers, well, white noises—the sound of the TV or someone else in the room, some sort of other stimulation during sleep.

She's had an increase in negative behaviors, as shown at the daycare, as well as at the foster home. There has been some regression in behaviors. Most recently she was in respite care for a week. I saw her during that week. She regressed during that time. When I saw her during the session, she started baby talking, displaying symptoms that I hadn't seen in KLS before. And this is while the foster mother wasn't there.

Ms. Siler ended her testimony by explaining that the PTSD could be caused by a number of factors, including witnessing domestic violence between parents and unstable living conditions. She testified that children who may not have been abused directly, but who witnessed abuse of others, will oftentimes display symptoms of PTSD.

[¶ 21] Other jurisdictions have recognized that subjecting a child to witnessing domestic violence between parents constitutes neglect and abuse of the child. Children who witness acts of violence between their parents may be in imminent danger of becoming impaired, if they have not already suffered actual emotional harm. *In re Athena M.,* 253 A.D.2d 669, 678 N.Y.S.2d 11 (A.D. 1 Dept.1998). Children are victimized by a climate of violence existing between their parents, even if they are not direct targets of

the abuse. *Heck v. Reed,* 529 N.W.2d 155, 163 (N.D.1995). A New York court of appeals upheld a finding of neglect based on abuse between parents, stating:

> While violence between parents adversely affects all children, younger children in particular are most likely to suffer from psychosomatic illnesses and arrested development (Lynn R. Kurtz, Note, *Protecting New York's Children: An Argument for the Creation of a Rebuttable Presumption Against Awarding a Spouse Abuser Custody of a Child,* 60 Albany L.Rev. 1345, 1351, n 45 (1997)).

*In re Lonell J.,* 242 A.D.2d 58, 673 N.Y.S.2d 116 (A.D. 1 Dept.1998). The law review article cited by the New York court describes scientific support for the proposition that witnessing abuse between parents has a profound negative impact on children:

> Studies have shown that children who witness domestic violence suffer many harmful psychological and emotional effects. Areas in which such problems exist include "health[,] socioemotional development[,] and behavior" relating to others. A more recent study, which compared children with no history of domestic violence to children with violent family backgrounds, found that the latter group had borderline to severe behavioral problems, below average adaptive behavior skills, lower reading levels, a significant difference in their social competence and more aggressive responses.

Comment, *Protecting New York's Children: An Argument for the Creation of a Rebuttable Presumption Against Awarding a Spouse Abuser Custody of a Child,* 60 Albany L.Rev. 1345, 1351, n 45 (1997) (footnotes omitted).

[¶ 22] Many, if not most, jurisdictions have echoed the conclusion that subjecting children to domestic violence justifies termination of parental rights. 4 *Child Custody and Visitation, Law and Practice* § 28.02[1][c] (Matthew Bender, Lexis 2004).

In *In re Stephen Tyler R.,* 213 W.Va. 725, 584 S.E.2d 581 (2003), the facts resemble those we are faced with in this case, and the court affirmed a termination of parental rights. In that case, the father struck the child's mother while she was holding the child in her arms, and repeatedly refused to cooperate in a family case plan or undergo therapy for anger management. In *In re: J.R.,* 991 S.W.2d 318 (Tex.Civ.App.1999), a Texas court terminated mother's parental rights finding that she knowingly placed or allowed the children to remain in conditions or surroundings that endangered their emotional or physical well-being.

[¶ 23] A young child is not a mere bystander to domestic violence. The consequences of subjecting KLS to such dysfunctional behavior are manifested in her documented psychological problems.[3] Additional evidence existed of Father's failure to provide proper care and supervision of KLS and his propensity to compromise her safety including the incident in which Father attempted to run Mother off the road while KLS was in the car with him.

[¶ 24] Further evidence of neglect was Father's failure to comply with the case plan, which is discussed in detail below. Father argues that his noncompliance with the case plan is immaterial because he claims he did not neglect KLS in the first place and, therefore, DFS could not force him to comply with the case plan. However, the district court sitting as the juvenile court always has jurisdiction over *both* parents under Wyo. Stat. § 14–3–402(a)(xiv). That statute defines "parties" to a neglect proceeding as including "the child, his parents, guardian or custodian, the state of Wyoming, and any other person." Furthermore, Father signed the case plan. Therefore, the court had jurisdiction over Father and his failure to comply with the case plan led to his neglect. *See EBH v. Hot Springs Dep't of Family Servs. (In re IH),* 2001 WY 100, 33 P.3d 172 (Wyo.2001) (Fa-

---

3. The Wyoming Legislature recognized domestic violence must be considered contrary to the best interest of children in the context of custody issues. Wyo. Stat. Ann. § 20–2–201(c) (LexisNexis 2003); *see Cobb v. Cobb,* 2 P.3d 578, 580 (Wyo.2000) where abuse, harassment, and stalk-

ing by mother's boyfriend occurred, we agreed that although the boyfriend had not directly harmed the children, the district court properly reasoned it was not required to "sit idly by until some form of physical or emotional harm is done to [the children]." *Id.*

ther failed to adhere to the case plan, which in part led to termination of his parental rights); *WR v. Natrona County Dep't of Family Servs. (In the Interest of DG)*, 916 P.2d 991 (Wyo.1996) (Mother signed and agreed to case plan, but did not complete programs suggested in case plan, leading to termination of parental rights).

[¶ 25] All of this evidence, when considered together, provides clear and convincing proof sufficient to support the district court's findings of neglect. *In re SED v. Carbon County Dep't of Family Services*, 2002 WY 168, ¶ 15, 57 P.2d 1235, ¶ 15 (Wyo.2002).

### Attempts to Rehabilitate the Family

[¶ 26] We now turn our focus to the second element of § 14–2–309(a)(iii), unsuccessful attempts to rehabilitate the family. As we have discussed above, DFS presented sufficient evidence of neglect to warrant placement of KLS in its custody and imposition of the requirements of the case plan as condition precedent to reunification of the family. When family reunification is the goal of the case plan, the statute imposes on DFS the responsibility to provide reasonable services necessary to accomplish that goal and sets out the steps the parents must take before reunification can occur. *SED*, ¶ 16. The record is replete with instances of DFS' fulfillment of its responsibilities and Father's failure to fulfill his.

[¶ 27] After failing to appear for the May 9, 2002, meeting to develop the case plan, Mother and Father appeared at a second meeting and stipulated to the plan prepared by DFS. The plan contained nine objectives and clearly warned that failure or refusal to successfully complete the case plan for family reunification would result in alternative permanency planning for said minor child, i.e. termination of parental rights, followed by adoption. The district court made the following findings regarding Father's failure to follow the case plan:

*Objective 1:* Substance abuse evaluation and treatment/counseling to address [addiction] and/or use of methamphetamine, marijuana and alcohol. [Father did not complete].

. . .

Father failed to attend a substance abuse evaluation at Piedmont. He [did] participate in a substance abuse evaluation at Big Horn Counseling in Basin, Wyoming. The results of that evaluation are questionable because Father falsely reported no history of abusive use of alcohol or drugs, and that he had lost his temper only once in the last three years.

*Objective 2:* Counseling to address issues such as but not limited to relationships, parenting, effective appropriate communication, anger and control issues. [Father did not complete].

Father failed to attend anger management counseling as recommended by Big Horn Counseling.

. . .

*Objective 3:* Parenting Classes. [Father did not attend] classes offered by DFS.

*Objective 4:* Child Support. Neither parent has paid support during the pendency of [these] proceedings.

Father did *not* provide proof of employment. . . .

*Objective 5:* Random UAs and breathalizer.

. . .

Father complied with 7 of a possible 46 UAs. [One] of 7 was positive for methamphetamine.

*Objective 6:* Establishing paternity was accomplished.

*Objective 7:* Contact with [KLS]. Failure to visit and provide nurturing for a child is neglect. [Father did not visit] KLS regularly despite the fact that many different visitation plans were developed by DFS, with input from parents, to accommodate their schedules.

Father attended less than half of scheduled visits. . . .

. . .

*Objective 8:* Father and Mother will secure and maintain adequate, consistent, and safe housing for a minimum of six consecutive months. [Father did not complete.]

After February 2002, when the Case Plan went into effect, Father provided DFS with many different addresses and telephone numbers....

Telephone numbers that were provided by [Father] were not always accurate and DFS was not always able to contact [Father].

[¶ 28] Father does not dispute the factual findings of the district court regarding his failures to meet the requirements of the case plan. Of the nine requisites in the case plan, the evidence demonstrated Father fully complied with only one—determining his paternity. Accordingly, the district court's finding regarding this element is fully supported by the evidence.

### Health and Safety of Child

[¶ 29] The third element of § 14–2–309(a)(iii) requires DFS to prove that returning KLS to Father's custody would seriously jeopardize her health and safety. Pam Emerson, director of Sheridan County Court–Appointed Special Advocates, testified that every time KLS was exposed to domestic violence, her safety was compromised. She testified:

Q: In what way was her safety compromised, then, by the alleged exposure to domestic violence?

A: In domestic violence situations, children's safety is compromised by parents that are out of control, by parents who are exhibiting anger physically. KLS' physical safety could be compromised by that. Certainly her emotional safety is compromised.

. . .

Q: When you say her physical safety could be compromised, what do you mean? The possibility exists that a shoe might come flying out of the melee?

A: Absolutely. That's not uncommon. We have—I read an affidavit for the Family Violence Protection Order that we supervised visitation on where [Mother] indicated that she was sitting in a chair while [Father] was choking her and KLS was sitting on her lap. And those are the

kinds of situations where a child's physical safety can be compromised.

[¶ 30] Testimony from Nelinda Dahmke, the DFS caseworker in charge of KLS' case, demonstrated that KLS would not be safe if returned to Father. She stated:

The risk of abuse or neglect, future harm to the child have not been reduced; and the position the department took was it was not safe for the child's return to these caretakers.

That decision was made in consultation with, again, my supervisor, CASA advocate, and then subsequent meetings, including contact with Mr. Tate, you, and Mr. Flaharty.

[¶ 31] Father's lifestyle continued to be unstable despite DFS' efforts to assist him in developing the skills necessary to be an adequate parent. As evidenced by testimony iterated above, clear and convincing evidence existed that KLS's health and safety would be in jeopardy if KLS were returned to Father's custody.

### Credibility of Witness

[¶ 32] Father challenges the testimony of the State's principal witness, Ms. Dahmke, as not credible and claims the court should not have relied upon it to support the termination of his parental rights.

[¶ 33] As we stated in *Keever v. Payless Auto Sales, Inc.*, 2003 WY 147, ¶ 7, 79 P.3d 496, ¶ 7 (Wyo.2003) (citations omitted):

We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. We affirm the trial court's findings if there is any evidence to support them. We accept the evidence of the prevailing party as true and give that party the benefit of all favorable inferences that can fairly be drawn from the evidence, while disregarding conflicting evidence.

[¶ 34] We have held that "the trial judge is in the best position to assess the credibility of witnesses and weigh their testimony, and, thus, this Court accords considerable deference to the trial judge's findings." *CAA v. ZWA (In the Interest of KRA)*, 2004 WY 18,

¶ 16, 85 P.3d 432, ¶ 16 (Wyo.2004) (citation omitted).

[¶ 35]   Father points to three instances in which he claims Ms. Dahmke mislead the district court.   Ms. Dahmke's lengthy testimony consisted of almost 200 pages in which she fully explained each of the alleged misleading statements to the satisfaction of the district court.   We find the minor inconsistencies in her testimony afford no basis for reversal of the district court's termination of Father's parental rights.

### District Court's Reliance on Father's Drug Conviction After Hearing

[¶ 36]   Father maintains the district court committed reversible error because it relied on evidence concerning Father's guilty plea to a felony drug charge that was entered after the termination hearing.   The State did not address this argument.   Although Father provides no support for his contentions on this issue, we will briefly address his concerns.

[¶ 37]   The district court's findings stated "Father is currently released on bond, pending sentencing after an April 28, 2003[,] plea of guilty to a felony charge of delivery of a controlled substance (methamphetamine) within this district."   Although the guilty plea took place after the termination of parental rights hearing, Father failed to explain how the district court's judicial notice of Father's criminal file was improper.   This Court has held that a court may take judicial notice of its own records in cases closely related to the one before it.   *State in Interest of C v. Platte County Department of Public Assistance and Social Services,* 638 P.2d 165, 172 n. 10 (Wyo.1981).   *See also State ex rel. Romsa v. Grace,* 43 Wyo. 454, 5 P.2d 301 (1931); *Ellis v. Cauhaupe,* 71 Wyo. 475, 260 P.2d 309 (1953); *Weber v. Johnston Fuel Liners, Inc.,* 540 P.2d 535 (Wyo.1975) (we do not deem it improper to take notice of the judgment, temporary restraining order, and opinion in the earlier case because of the identity of the parties and the interrelationship of these actions).   While the guilty plea in this case was entered after the termination hearing, the district court was well aware of the pending charges at the time of the hearing and of Father's repeated failure of the drug tests required by the case plan.

[¶ 38]   Whether or not Father pled guilty to a drug-related charge was of minor importance in the face of the overwhelming evidence of abuse and neglect.   The court made multiple and detailed findings of fact which demonstrated neglect.   We fail to see how the reference to the guilty plea that occurred after the hearing prejudiced Father.   *See In the Matter of A.C.B.,* 598 N.E.2d 570, 573 (Ind.Ct.App.1992) (where Father alleged the district court improperly took judicial notice of a paternity test in its findings of fact, the appellate court failed to see the prejudice that resulted).

### CONCLUSION

[¶ 39]   The district court fully considered all of the evidence and provided detailed and thorough findings on each of the elements required by the statute for termination of Father's parental rights.   Clear and convincing evidence proved Father subjected KLS to continuing abuse and neglect, and her safety and well-being requires that she not be returned to his custody.   We affirm the district court's findings and order terminating Father's parental rights.